UNITED STATES of America,
Plaintiff–Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO; the Commission of La Cosa Nostra; Anthony Salerno; Matthew Ianniello; Anthony Provenzano; Nunzio Provenzano; Anthony Corallo; Salvatore Santoro; Christopher Furnari, Sr.; Frank Manzo; Carmine Persico; Gennaro Langella; Philip Rastelli; Nicholas Marangello; Joseph Massino; Anthony Ficarotta; Eugene Boffa, Sr.; Francis Sheeran; Milton Rockman; John Tronolone; Joseph John Aiuppa; John Phillip Cerone; Joseph Lombardo; Angelo Lapietra; Frank Balistrieri; Carl Angelo Deluna; Carl Civella; Anthony Thomas Civella; General Executive Board, International Brotherhood of Teamsters, Chauffeurs,

Warehousemen and Helpers of America; Jackie Presser, General President; Weldon Mathis, General Secretary–Treasurer; Joseph Trerotola, First Vice President; Robert Holmes, Sr., Second Vice President; William J. McCarthy, Third Vice President; Joseph W. Morgan, Fourth Vice President; Edward M. Lawson, Fifth Vice President; Arnold Weinmeister, Sixth Vice President; John H. Cleveland, Seventh Vice President; Maurice R. Schurr, Eighth Vice President; Donald Peters, Ninth Vice President; Walter J. Shea, Tenth Vice President; Harold Friedman, Eleventh Vice President; Jack D. Cox, Twelfth Vice President; Don L. West, Thirteenth Vice President; Michael J. Riley, Fourteenth Vice President; Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis, Sixteenth Vice President; and Salvatore Provenzano, Former Vice President, Defendants,

International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, Defendant–Appellant,

Teamsters Locals 1, 15, 25, 42, 49, 55, 59, 63, 64, 70, 72, 78, 82, 85, 87, 122, 157, 166, 170, 182, 186, 208, 237, 259, 278, 287, 291, 296, 302, 340, 379, 380, 389, 399, 404, 432, 437, 490, 494, 495, 496, 504, 526, 588, 597, 598, 624, 630, 633, 653, 665, 686, 687, 692, 707, 829, 841, 848, 853, 858, 860, 896, 911, 952, and 2707; Joint Councils 7, 10, 16 and 18; and Joint Council 41 and Its Thirty–Three Affiliated Local Unions, Appellants.

Nos. 830, 831, 833, 834, 892 to 895.
Dockets 90–6216, 90–6228, 90–6234, 90–6244, 90–6246, 90–6248, 90–6252 and 90–6254.

United States Court of Appeals, Second Circuit.

Argued Feb. 11, 1991.

Decided April 12, 1991.

---

James T. Grady, Gen. Counsel, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, Washington, D.C. (Jed S. Rakoff, Audrey Strauss, Walter P. Loughlin, Robert P. Knapp III, Ralph P. DeSanto, Vincent P. Esposito, Jr., Mudge Rose Guthrie Alexander & Ferdon, New York City, of counsel), for defendant-appellant.

Duane B. Beeson, San Francisco, Cal. (Beeson, Tayer, Silbert, Bodine & Livingston, San Francisco, Cal., Richard Dorn, Seth M. Kupferberg, Sipser, Weinstock, Harper & Dorn, New York City, Robert D. Vogel, Wohlner, Kaplon, Phillips, Vogel, Shelley & Young, Encino, Cal., Daniel Engelstein, Vladeck, Waldman, Elias & Engelhard, New York City, of counsel), for appellants Joint Councils 7, 16 and 18, and Locals 15, 63, 70, 72, 78, 85, 87, 166, 182, 186, 208, 237, 278, 287, 291, 296, 302, 389, 399, 432, 490, 495, 588, 598, 624, 630, 665, 687, 692, 848, 853, 858, 860, 896, 911, 952, and 2707.

John R. Climaco, Cleveland, Ohio (Paul S. Lefkowitz, Thomas M. Wilson, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, Ohio, Roy Barnes, Wendell Sheperd, New York City, of counsel), for appellants Joint Council 41 and Its Thirty-Three Affiliated Local Unions.

Richard W. Mark, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Edward T. Ferguson, III, Asst. U.S. Atty., of counsel), for plaintiff-appellee.

Eugene S. Friedman, Jay P. Levy-Warren, Friedman & Levy-Warren, New York City, for appellant Highway and Local Motor Freight Drivers, Dockmen and Helpers, Local Union 707.

John J. Kenney, Jr., Grady and Dwyer, Boston, Mass., for appellants Joint Council 10 and Locals 1, 25, 42, 49, 55, 59, 64, 82, 122, 127, 157, 170, 259, 340, 379, 380, 404, 437, 494, 496, 504, 526, 597, 633, 653, 686, 829, and 841.

Laurence Gold, Walter Kamiat, Washington, D.C., for amicus curiae American Federation of Labor and Congress of Indus. Organizations.

Susan M. Jennik, Clyde W. Summers, Judith R. Schneider, Brooklyn, N.Y., for amicus curiae Ass'n for Union Democracy.

Before VAN GRAAFEILAND, WINTER and WALKER, Circuit Judges.

WINTER, Circuit Judge:

In March 1989, the government and the International Brotherhood of Teamsters ("IBT") agreed to settle the instant litigation. The settlement agreement was embodied in an order ("Consent Decree") of the district court. These appeals are the latest installment in a series of disputes over the implementation of the Consent Decree.

Various IBT-affiliated joint councils and union locals (collectively "Affiliates") appeal from the order approving the election rules ("Election Rules Order") that are to govern the upcoming elections of delegates to the IBT Convention, the nomination process at the Convention, and the rank-and-file election of IBT officers. *See United States v. IBT*, 742 F.Supp. 94 (S.D.N.Y. 1990) (*"Election Rules Order"*). They challenge the order on the ground that it provides methods for selecting delegates to the IBT Convention and for electing IBT officers that differ from those specified in the IBT Constitution. The Affiliates contend that, because they were not parties to the underlying civil RICO action or the Consent Decree, that Decree cannot alter the IBT Constitution without their consent.

The IBT also appeals from the Election Rules Order, claiming that several provisions of the election rules are beyond the scope of the Consent Decree or contrary to federal labor law. In addition, the IBT appeals from an order approving the staffing requests of the court-appointed officer who is to supervise the elections ("Staffing Order").

We conclude that the Affiliates are bound by the Consent Decree's revision of the methods by which IBT Convention delegates and officers are selected because the IBT was an adequate representative of the collective IBT membership. We exclude "interested" employers from those non-IBT members who may aid candidates in obtaining accounting and legal services. However, the other election rules and the court-appointed officer's staffing request properly implement the terms of the Consent Decree.

## BACKGROUND

In June 1988, the government brought suit under the civil remedies provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (1988), naming as defendants the IBT, its General Executive Board ("GEB"), the individual members of the GEB, the Commission of La Cosa Nostra, and various reputed members and associates of La Cosa Nostra, a criminal organization. The 113–page complaint alleged a massive racketeering enterprise and a conspiracy to participate in that enterprise. In particular, it alleged that the GEB and its individual members had allowed principals of La Cosa Nostra to control and corrupt the IBT and various of its affiliated area conferences, joint councils, locals, and benefit funds. According to the complaint, La Cosa Nostra principals, aided and abetted by the GEB, had, by means of fraud, embezzlement, bribery and extortion, dominated the IBT. The government alleged that La Cosa Nostra selected and ensured the election of their own candidates for the position of IBT General President. In addition, La Cosa Nostra, aided and abetted by members of the GEB, allegedly used the proce-

dure for selecting IBT officers to control the IBT and deprive its membership of free and fair elections.

The government sought broad relief. It asked the district court to: (i) enjoin members of La Cosa Nostra from associating with the IBT and its affiliates, (ii) enjoin present and future members of the GEB from associating with members of La Cosa Nostra, (iii) order individual defendants convicted of RICO violations to disgorge the proceeds from those violations and to refrain from contact with the IBT or any other labor organization, (iv) order a new election of GEB members under the supervision of a court-appointed trustee, (v) appoint a trustee who, until a fair election could be held, would assume the powers of the GEB whenever necessary to protect the rights of IBT members, (vi) enjoin all IBT members and affiliated entities from interfering with the trustee, (vii) issue a judgment declaring that the IBT has been controlled and exploited by La Cosa Nostra through multiple RICO violations, and (viii) award the government its costs of the suit.

The IBT moved to dismiss the complaint or, in the alternative, to require the joinder, as indispensable parties under Fed.R.Civ.P. 19(a), of all IBT-affiliated local unions, joint councils, area conferences, and benefit funds that might be subject to an adverse fact determination or any form of relief affecting their interests. The district court denied the motion. It concluded that "[t]he relief requested relates to the IBT [and] does not directly affect the rights of the [affiliates]." *United States v. IBT*, 708 F.Supp. 1388, 1404 (S.D.N.Y.1989). In March 1989, the parties reached a settlement embodied in a Consent Decree entered by the district court.

Pursuant to the Consent Decree, the district court appointed three court officers to oversee certain aspects of the affairs of the IBT: the Investigations Officer, the Independent Administrator, and the Election Officer. The Investigations Officer has the authority to initiate disciplinary charges against officers, members, and employees of the IBT and its affiliates and to institute trusteeship proceedings with re-

spect to local unions or other affiliated entities. The Independent Administrator has general authority to oversee the implementation of the Consent Decree. He also presides at hearings on disciplinary charges.

The Election Officer is responsible for supervising the election of IBT officers as provided by the Consent Decree. Under the pre-existing IBT Constitution, local union officers are delegates to the IBT Convention. At the Convention, these delegates nominate and elect the IBT officers. The Consent Decree eliminates the *ex officio* designation of delegates and specifies a rank-and-file secret ballot election of Convention delegates. The Convention delegates nominate candidates for IBT offices. IBT officers are then elected by direct rank-and-file secret ballot elections. The Consent Decree also provides that the Election Officer shall supervise the 1991 election of IBT officers and certify the election results.

Finally, the Consent Decree provides that, upon its satisfactory implementation, the district court will entertain a joint motion for dismissal of the action. Since entry of the Consent Decree, numerous disputes have arisen over its implementation. For example, the IBT challenged the authority of the Election Officer to supervise and promulgate election rules governing all phases of the upcoming election of IBT officers. *See United States v. IBT ("Election Officer Order"),* 723 F.Supp. 203, *stay and certification denied,* 728 F.Supp. 920 (S.D.N.Y.), *appeal dismissed,* No. 89–6252 (2d Cir. Dec. 13, 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). Two individuals challenged the application to them of the Consent Decree's disciplinary procedures. *See United States v. IBT ("Friedman & Hughes"),* 725 F.Supp. 162, *stay denied,* 728 F.Supp. 924 (S.D.N.Y.), *motion to dismiss and motions to stay denied,* Nos. 89–6248, 89–6250 (2d Cir. Dec. 12, 1989), *later proceeding,* 743 F.Supp. 155 (S.D.N.Y.1990), *aff'd,* 905 F.2d 610 (2d Cir.1990).

Various affiliated entities also have challenged the implementation of the Consent Decree in collateral suits filed in Chicago, Cleveland, and New Jersey. In response to these suits, the district court issued an order, pursuant to the All Writs Act, 28 U.S.C. § 1651 (1988), enjoining all members and affiliates of the IBT from "filing or taking any legal action that challenges, impedes, seeks review of or relief from, or seeks to prevent or delay any act of [the court-appointed officers] in any court or forum in any jurisdiction except this Court." *United States v. IBT,* 726 F.Supp. 943 (S.D.N.Y.1989) (order to show cause and temporary restraining order), *made permanent by United States v. IBT* ("All Writs Opinion"), 728 F.Supp. 1032 (S.D.N.Y.1990), *aff'd,* 907 F.2d 277 (2d Cir.1990). In its opinion, the district court also expressed the view that the affiliates were "bound" by the terms of the Consent Decree. On appeal, we affirmed the injunction but declined to consider the question of whether the affiliates were so bound. *United States v. IBT,* 907 F.2d 277 (2d Cir.1990).

The present appeal arises from the district court's consideration of two applications by the Independent Administrator. In Application X, the Independent Administrator sought approval of the final election rules promulgated pursuant to the Election Officer's authority under the Consent Decree to "supervise" the 1991 election of IBT officers. The rules governed all phases of the election process, including the election of Convention delegates by the rank-and-file of the Affiliates, the conduct of the 1991 Convention, nomination of IBT officer candidates, and the subsequent rank-and-file election of IBT officers. The IBT opposed Application X, renewing its argument that the Election Officer had no power to issue rules for any part of the three-stage election process or to supervise the IBT Convention delegate elections. In addition, the IBT made specific challenges to a number of the proposed rules. *See Election Rules Order,* 742 F.Supp. at 98–106. Two nonparty IBT-affiliated local unions also filed papers supporting the IBT's broad challenge to the Election Officer's power and asserting that IBT affiliates

were not bound to comply with the election provisions of the Consent Decree.

On July 10, 1990, the district court granted Application X and approved the proposed election rules with some modifications. *Election Rules Order*, 742 F.Supp. 94. The court rejected the IBT's general challenge to the supervisory authority of the Election Officer on the strength of its earlier opinion on that subject. *Id.* at 98; *see Election Officer Order*, 723 F.Supp. at 206–07. The court also held that the disputed rules were a proper exercise of the Election Officer's authority to supervise the election of IBT officers.

In response to submissions from *amici curiae* Teamsters for a Democratic Union ("TDU") and Association for Union Democracy ("AUD"), the district court modified the proposed election rules in two respects. First, the court adopted TDU's proposal that the IBT membership list be made available for copying by all "accredited" candidates. *Election Rules Order*, 742 F.Supp. at 101–04. Second, at the suggestion of AUD, the court held that the Election Officer's authority to supervise the elections required him to conduct all phases of the elections. *Id.* at 106–07. Finally, incorporating by reference the reasoning of its All Writs Opinion, the district court ordered that all IBT affiliates were "bound" to comply with the election rules on pain of contempt. *Id.* at 108.

In Application XI, the Independent Administrator sought approval of the Election Officer's request to hire regional coordinators and field staff to assist in supervising the delegate and officer elections. In an oral order, the district court granted this application as a reasonable exercise of the Election Officer's explicit hiring authority under the Consent Decree.

On appeal, the Affiliates contend that, because they were never made parties to the underlying RICO action and did not agree to the entry of the Consent Decree, they are not bound by its election provisions. In effect, they challenge the validity of the Consent Decree's provisions for rank-and-file elections of Convention delegates and IBT officers. The IBT contends that election rules concerning the publication of campaign literature in the union magazine, the release of the union membership list to candidates, employer campaign contributions for legal and accounting services, and the definition of employers for purposes of the general prohibition on employer campaign contributions are contrary to the terms of the Consent Decree and violate federal law. The government argues that the district court's orders are appealable neither as "final decisions" nor as modifications of an injunction.

## DISCUSSION

After addressing the jurisdictional issues, we consider the Affiliates' contention that they are not bound by the election provisions of the Consent Decree and the IBT's specific objections to the election rules.

### A. *Appellate Jurisdiction*

#### 1. Finality

 The government contends that the orders in question are not appealable final orders under 28 U.S.C. § 1291 (1988). It argues that the Election Rules Order and the Staffing Order are simply intermediate steps in a process that will culminate in the final certification of the election results, at which time review of the orders governing the election will be appropriate. We disagree.[1]

---

**1.** The government also argues that the IBT may not appeal because it has agreed to be bound by the Consent Decree. Although the IBT unquestionably has "waived its objections to the terms of the [consent] order," *Martin Marietta Corp. v. FTC*, 376 F.2d 430, 434 (7th Cir.), *cert. denied*, 389 U.S. 923, 88 S.Ct. 237, 19 L.Ed.2d 265 (1967), the rule against appellate review of substance of a consent order applies only when the order explicitly covers the question sought to be appealed or when the issue on appeal does not raise a substantial question of interpretation. *See Friedman & Hughes*, 905 F.2d at 616. The IBT's appeal, however, challenges aspects of the Election Rules Order and Staffing Order that are arguably inconsistent with terms of the Consent Decree or arguably extend or modify the relief provided in the Decree. Such orders are subject to *de novo* appellate review. *See United States v. Western Elec. Co.*, 900 F.2d 283,

If review of the validity of the orders that govern the elections must await completion of those elections, there may be no effective remedy for an erroneous construction of the Consent Decree. After the election, every objection to those orders will be met by the virtually unanswerable claim that no showing has been made that the outcome of the election was affected. Moreover, even if we were prepared to order a new election in the absence of any evidence that an error had affected the original election—causing considerable delay and perhaps changing the result for reasons unrelated to the invalid order—the funds expended on the original election would be lost. Although the IBT is obligated to pay for the Election Officer's supervisory activities, there is no provision for reimbursement for expenditures on an election that is ultimately held invalid.

Similar considerations are found in the appeal from the Staffing Order. Citing the pressing deadline imposed by the Consent Decree for conducting the elections, the Election Officer applied to the district court to obtain advance approval of his plans to hire regional coordinators and support staff. Paragraph 12(H) of the Consent Decree provides that the court-appointed officers shall file an expense report once every three months. The IBT General President then has fourteen days in which to contest the bill, after which time the IBT is obligated to pay any uncontested expenses. If review of the decision to approve the staffing request is deferred until a bill for these services is presented, the Election Officer cannot guarantee potential employees that they will be paid. The practical effect of delaying review may thus be precisely the disruption of the Election Officer's supervisory activities that Application XI was intended to avoid.

The administration of complex consent decrees such as the present one gives rise to issues of appellate review that differ from those in ordinary litigation. Whereas rulings in ordinary litigation can be reviewed for error and effect on the judg-

ment after that judgment is final, rulings in the course of administering a consent decree concern implementation of the judgment itself, and often require intermediate acts by parties that may be unreviewable if appeals are delayed until compliance is final. A flexible approach is thus necessary, similar to that applied in reviewing bankruptcy decisions, *see In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1283 (2d Cir. 1990), another area in which intermediate rulings are frequently not reviewable at the conclusion of proceedings.

The orders in the instant matter also fall within the rationale of decisions elaborating the "collateral order" doctrine of *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), which renders appealable certain orders that cannot be effectively reviewed after final judgment is entered. *See also Herbst v. International Tel. & Tel. Corp.*, 495 F.2d 1308, 1312 (2d Cir.1974) (order granting class action appealable); *United States v. Wood*, 295 F.2d 772, 778 (5th Cir.), *cert. denied*, 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1961) (order determining substantial rights that will be irreparably lost if review delayed, appealable).

### 2. Jurisdiction Over The Affiliates' Claims

 The government's second jurisdictional argument is that the Affiliates, as nonparties, have no standing to appeal from the Election Rules Order. Again, we disagree. The argument is based on three premises: (i) the Affiliates are nonparties, (ii) the promulgation of the election rules does not affect any interest of the Affiliates, and (iii) the Affiliates did not attempt to intervene and present their arguments to the district court.

Although the general rule is that only a party of record may appeal a judgment, a nonparty may appeal "when the nonparty has an interest that is affected by the trial court's judgment." *Hispanic Society v.*

293 (D.C.Cir.1990). *See also United States v. Armour & Co.*, 402 U.S. 673, 681–83, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971) (exercising

appellate jurisdiction over "construction of an existing consent decree").

*New York City Police Dep't*, 806 F.2d 1147, 1152 (2d Cir.1986). The Affiliates' appeal from the Election Rules Order is based on their asserted contractual interest in preserving those provisions of the IBT Constitution concerning election of IBT officers that are abrogated by the Order. This interest is sufficient to confer standing to challenge the district court's decision.[2]

B. *The Affiliates' Challenge to the Election Rules Order*

■ Under the IBT Constitution, the officers of affiliated locals serve by virtue of their office as delegates to the IBT Convention. *See* IBT Constitution, Art. III, § 5(a)(1). The Consent Decree requires a direct vote among the rank-and-file of locals to elect Convention delegates. *See* Consent Decree, ¶ 12(D)(ii). The IBT Constitution also provides that Convention delegates nominate and elect IBT officers. *See* IBT Constitution, Art. IV, § 2. The Consent Decree requires a union-wide rank-and-file election of IBT officers. *See* Consent Decree, ¶ 12(D)(vii).

The Affiliates contend that, as nonparties to the underlying RICO action and the resultant Consent Decree, they are not bound by the election provisions of the Decree. In particular, they argue that those provisions that displace the IBT Constitution are not binding on them unless and until the amendments have been ratified at an IBT Convention properly constituted under the original IBT Constitution. We disagree.

In *Friedman & Hughes*, a union officer who was not a party to the Consent Decree argued that he could not be removed from office by the Administrator because the disciplinary provisions of the Decree altered the IBT Constitution. We held otherwise, stating:

> While we need not decide whether Hughes as a non-party could be bound by each and every term of the Consent De-

cree, he clearly could be bound by the terms of the disciplinary mechanism set in place by the Consent Decree. This is so because the investigatory and disciplinary powers of the court-appointed officers are proper delegations of the powers of the IBT General President and the GEB within the scope of the IBT Constitution that binds all members of the IBT, and because the IBT Constitution, in Article XXVI, section 2, contemplates amendment by the GEB, under the circumstances of this case, as a result of judicial direction.

905 F.2d at 622.

The IBT constitutional provision mentioned, Article XXVI, Section 2, provides that, if a court declares a provision "invalid or inoperative," the GEB may "substitute ... a provision ... which will be in accord with the intent and purpose of the invalid provision." *Friedman & Hughes* thus held that, at least as far as the constitutionally delegated powers of the IBT and its officers are concerned, IBT members, and presumably affiliates, are bound by the Consent Decree. We believe that similar reasoning applies to provisions governing the selection of IBT Convention delegates and IBT officers.

Where the subject matter of an IBT constitutional provision relates to powers of the international rather than of local unions, the IBT may agree to a consent decree entered by a court that renders the provision inoperative and that IBT local unions and members are bound by the terms of that decree. In *Friedman & Hughes*, the provisions of the Consent Decree in issue had transferred international disciplinary powers to the Administrator, extended the statute of limitations for bringing disciplinary charges against IBT members, and, we held, rendered nugatory IBT constitutional provisions empowering the IBT president and GEB to issue authoritative interpretations as to the meaning of

---

**2.** The government's contention that the Affiliates waived any right to challenge the Election Rules Order by failing to intervene in the district court proceedings is similarly unavailing. In *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), the Supreme Court held that a failure to intervene does not bar a subsequent attempt to challenge actions taken pursuant to a consent decree.

the IBT Constitution. Like the Affiliates in the instant matter, Hughes asserted that he had contractual rights to be disciplined only through the constitutionally designated processes rather than by the Administrator and that any disciplinary action taken against him must be consistent with the interpretive views expressed by the IBT president and GEB. We disagreed, holding in effect that Article XXVI, Section 2 authorizes the IBT to settle litigation by entering into a consent decree rendering certain IBT constitutional provisions "inoperative." Our holding was qualified by the observation that the provisions in question in *Friedman & Hughes* related to powers of the international union, even though the effect on the nonparty local officer was drastic.

In the instant matter, the IBT constitutional provisions rendered inoperative concern not the powers of the international union but the method by which international officials—Convention delegates and international officers—are selected. The subject matter of the constitutional provisions thus relates to the governance of the international which has been expressly delegated to the General President under Article VI, Section 1(b) of the IBT Constitution. The challenged provisions do not relate to, or intrude upon, the governance of local unions or the conduct of collective bargaining by local unions. Indeed, the Decree's election provisions are in one sense less intrusive on local unions than the Decree's transfer of disciplinary powers challenged in *Friedman & Hughes*. In that case, the transfer of powers led to the removal from office of local union officers by court-appointed officials. We believe, therefore, that our decision in the instant matter falls within the rationale of *Friedman & Hughes* and that the Affiliates are bound by the Consent Decree.

Even without Article XXVI, Section 2, however, we believe that the Consent Decree binds the Affiliates insofar as the election of IBT Convention delegates and IBT officers is concerned. It is true that, for purposes of interpretation, a consent decree is treated as a contract among the settling parties, *Firefighters v. City of* *Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), and that the terms of a consent decree cannot be enforced against those who are not parties to the settlement. *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). However, there are several exceptions to this general rule. Nonparty members of a class

> may be bound by the judgment where they are in fact adequately represented by parties who are present, or where they actually participate in the conduct of the litigation in which members of the class are present as parties, or where the interest of the members of the class, some of whom are present as parties, is joint, or where for any other reason the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter.

*Hansberry v. Lee,* 311 U.S. 32, 43, 61 S.Ct. 115, 118–19, 85 L.Ed. 22 (1940) (citations omitted). *See also Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 2184, n. 2, 104 L.Ed.2d 835 (1989) (citing *Hansberry*); *Montana v. United States,* 440 U.S. 147, 154–55, 99 S.Ct. 970, 974–75, 59 L.Ed.2d 210 (1979) (applying collateral estoppel against United States which, though not a party to the litigation, had exercised control over the litigation on behalf of one of the parties). *Friedman & Hughes* held that with regard to the international union's exercise of disciplinary powers, Article XXVI, Section 2, "entitle[d] the [IBT] to stand in judgment for [Hughes]." *Hansberry v. Lee,* 311 U.S. at 43, 61 S.Ct. at 118–19. We also believe that the legitimate interests of the Affiliates were "adequately represented by [the IBT]." *Id.*

In *Martin v. Wilks,* the plaintiff challenged a consent decree to which he was not a party on the ground that it caused racial discrimination in his employment. The Supreme Court upheld his right to bring the challenge on the ground that he had not been represented in the litigation resulting in the consent decree. In the instant matter, the Affiliates analogize alleged contractual rights governing their relationship to the IBT to the plaintiff's right

in *Martin v. Wilks* to be free from racial discrimination in employment. We believe the analogy fails.

The instant matter involves a hierarchical association of an international union, a multitude of local unions, and the IBT membership. At stake are the individual interests of the IBT, each local, and each member. However, there are also collective interests involved, in particular the collective interests of the IBT membership. It may well be that the IBT cannot unilaterally alter the IBT Constitution and that an affiliate or even a single member has a contractual right to enjoin such an attempted alteration. Nevertheless, we also believe that an Affiliate or member cannot veto the IBT's settlement of this unique civil RICO action, at least insofar as the Consent Decree provides for membership elections of Convention delegates and IBT officers. The relief sought in this case, which surely would have been granted were the allegations of the complaint proven, would have led to the appointment of a trustee to take over the IBT's affairs. That appointment would have rendered questions concerning the method of selecting IBT Convention delegates and IBT officers insignificant, because their powers would have been subject to the will of the trustee.

The question, therefore, is whether the international union was powerless to accept a settlement calling for votes by the membership in the face of a claim of contractual right by a single affiliate or single member where the alternative was litigation that might have led to the appointment of a trustee whose powers likely would have abrogated even greater portions of the IBT Constitution. We believe that the international is not so powerless. In *Martin v. Wilks*, the plaintiff was asserting a right derived from a federal statute that assuredly could be asserted at will. In the instant matter, the Affiliates are asserting rights derived from their association with the international, all other locals, and the IBT membership. The analogy to contract law is not, we believe, so strong as to entitle the Affiliates to assert those rights at will where that assertion may be contrary to the interests of, and even destructive of, that association.

There is surely a collective interest of the IBT membership in both eliminating the influence of organized crime within the union and in doing so at the least cost to internal union processes. To the extent that the question before us relates to the role of the membership in selecting IBT Convention delegates and IBT officers, we perceive no institutional or contractual interest of individual local unions that is legitimately separate from that of the collective membership of all local unions. The precise question is whether the presence of local unions in the litigation was necessary to represent the collective IBT membership. The IBT, however, like the Affiliates, is a representative of the collective membership, and, so far as the role of the IBT membership in selecting Convention delegates and IBT officers is concerned, we see little reason to view the individual local unions as a better representative of the collective IBT membership than the IBT itself.

With regard to the elimination of the local union officers' *ex officio* status as Convention delegates, the Affiliates' position is actually adverse to the IBT membership. Under the Consent Decree, if local union members wish to send their local officers to the Convention as delegates, they need only vote for them in free elections. The Affiliates' argument in this regard is nakedly designed to prevent the membership from selecting delegates that it might prefer over those local officers who have caused their Affiliates to challenge the Consent Decree.

With regard to the direct membership election of IBT officers, the collective interests of rank-and-file members of the Affiliates do not differ from the collective interests of IBT members as a whole. Again, the presence of the Affiliates was not necessary to represent the interests of the membership, which was adequately represented by the IBT.

To be sure, the Affiliates may be correct in arguing that the IBT officers who

agreed to the Consent Decree were influenced by the fear of civil monetary liability and of losing their offices to a court-appointed trustee. However, the appointment of such a trustee in effect would have abrogated the very rights that the Affiliates claim to be seeking to protect in this appeal as well as numerous other IBT constitutional provisions. For us, the dispositive issue is whether the collective IBT membership was adequately represented in the litigation leading to the Consent Decree. We believe that in determining that issue, we may look to the content of the provisions of the Consent Decree that are challenged on this appeal. The fact that those provisions broaden the rights of the IBT membership satisfies us that the membership was adequately represented.

### C. The IBT's Challenges to the Election Rules Order and Staffing Order

We turn now to the IBT's challenges to particular provisions of the Election Rules Order and Staffing Order.

#### 1. The Publication Rule

■ The final election rules provide that each "accredited candidate" for union office—each candidate with petition signatures of 2.5 percent of the relevant membership pool—may have his campaign literature published in the IBT's monthly magazine, the *International Teamster. See* Election Rules, Article VIII, § 9; Article III, § 1. The district court concluded that this rule was a legitimate exercise of the Election Officer's authority under the Consent Decree to "distribute materials about the election to the IBT membership," *see* Consent Decree ¶ 12(D), because publication in the union magazine was the "most efficient and effective vehicle" for such distributions. *Election Rules Order,* 742 F.Supp. at 99–100.

The IBT objects on the ground that, although the Consent Decree empowers both the Election Officer and the Administrator to "distribute materials" to the IBT membership, it authorizes only the Administrator "to publish a report in each issue of the *International Teamster* concerning the ac-

tivities of the [court officers]." Consent Decree, ¶¶ 12(D), 12(E). According to the IBT, the parties could not have understood the power to "distribute materials" to include the power to "publish" in the IBT monthly magazine or the Consent Decree would not have used both terms. Under that view, the district court improperly "effected a substantial modification of the original decree." *Hughes v. United States,* 342 U.S. 353, 357, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952).

We do not read the Consent Decree's provisions for the distribution of materials so restrictively. The portion of the Decree authorizing the Administrator to publish a report in each issue of the *International Teamster* ensures that the Administrator has a *per se* right to communicate monthly with the membership through the union magazine. We see no reason to read such a clause as restricting the authority of other court officers by implication. The fact that the parties specifically foresaw that the Administrator would need to publish reports in the magazine does not foreclose the Election Officer and district court from determining in the course of events that use of the magazine is also necessary to ensure an effective rank-and-file election.

We find ample authority in the Consent Decree for the order in question. The Election Officer has broad authority to "supervise" the IBT election process as well as to "distribute materials." The Election Officer thus has substantial discretion to impose election rules and procedures that ensure that the upcoming elections are free, fair and informed. In light of this broad supervisory authority, the Election Officer's independent right to distribute materials should be read to encompass any reasonable effort to inform the IBT membership of matters relating to the election.

The Election Officer's plan to permit accredited candidates to publish campaign literature in the *International Teamster* is just such a reasonable effort. The election mandated by the Consent Decree will be the first occasion that the IBT rank-and-file membership has been able to vote directly for IBT officers, and special measures to

inform the members about the candidates are necessary. The publication rule is, as the district court found, a particularly "efficient and effective vehicle" for this purpose.

Relying on its "right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977), the IBT also argues that the publication rule encroaches on its First Amendment rights. However, by consenting to the Election Officer's power under the Consent Decree, the IBT waived any objection to the Election Officer's exercise of legitimate authority.

2. The Membership List Rule

■ The election rules promulgated by the Election Officer afforded candidates their statutorily-prescribed opportunity to inspect the IBT membership lists within thirty days of the election and provided for the limited release of random samples from the lists to opinion polling entities. *See* Election Rules, Art. VIII, § 2; Labor Management Reporting and Disclosure Act ("LMRDA"), Section 401(c), 29 U.S.C. § 481(c) (1988). The IBT objected to the limited release, while *amicus* TDU argued that candidates should have unlimited access to the membership lists. The court found the following:

> First, extraordinary measures are necessary to ensure that this election succeeds in upholding the permanent injunction at ¶ E.10 barring IBT association with organized crime. Second, the IBT has misused its membership lists in its incessant attacks against the Court Officers, Government and this Court objecting to the implementation of the Consent Decree in the *International Teamster*. In these attacks the IBT has revealed its opposition to free elections.

*Election Rules Order*, 742 F.Supp. at 102. The court also asserted that "strong and extraordinary measures" were necessary "to foster alternative candidates." It concluded that the IBT's "fatally biased official editorial posture in the official union publication" constituted a misuse of its membership lists for the purposes of Section 401(c) of the LMRDA, 29 U.S.C. § 481(c) (1988). *Id.* at 102–03; *see also* 29 C.F.R. § 452.71 (1990). The district court therefore ruled that all accredited candidates should be allowed to copy the membership lists. Such access, however, may be obtained only after the candidate has submitted an affidavit that he or she will not permit inspection or copying of the list by third parties. A violation of this commitment is punishable by contempt. *Election Rules Order*, 742 F.Supp. at 104.

Although our reasoning differs from that of the district court, we find support in the Consent Decree for this limited release of the membership list. The IBT's objection is based principally upon LMRDA Section 401(c), 29 U.S.C. § 481(c) (1988), which protects the confidentiality of union membership lists unless a union is found to have misused its list. A Department of Labor regulation defines misuse as "discrimination in favor of or against any candidate with respect to the use of lists of members." 29 C.F.R. § 452.71(b) (1990). The remedy provided for such misuse is to "accord the same privilege to all candidates who request it." *Id.* Typically, misuse has involved discriminatory access to the lists or the use of a union publication to campaign for incumbent candidates. *See Usery v. International Organization of Masters, Mates & Pilots*, 538 F.2d 946, 948 (2d Cir.1976) (union newsletter praising incumbent president and criticizing opponent). *See also Bliss v. Holmes*, 721 F.2d 156, 158–59 (6th Cir.1983) (excessive publicity in favor of incumbent president); *Hodgson v. United Mine Workers*, 344 F.Supp. 17, 22 (D.D.C.1972) (many references to incumbent candidate in union magazine but no mention of challenger or his candidacy). We agree with the IBT that no finding of the district court in the instant matter satisfies this standard.

However, the Election Officer's authority under the Consent Decree to supervise the election and to distribute campaign materials clearly contemplates some use of the membership list, consented to by the IBT, beyond that permitted by the LMRDA. Certainly the provision for inspection and use of random samples suggested by the

Election Officer was well within his authority, and even more expansive use by candidates is desirable to ensure that the rank-and-file membership is fully informed. The district court's order allows accredited candidates to copy the membership list and use it only for purposes of the election, a restriction enforceable by contempt. Given this restriction and the need for an informed IBT electorate, we find nothing objectionable in the district court's modification of the election rules.

### 3. The Legal and Accounting Expenses Rule

■ The election rules exclude from the Consent Decree's general prohibition on employer and labor organization contributions, *see* Consent Decree ¶ 8, any

> financial support or services from employers or labor organizations (other than the [IBT or any affiliated entity]) to pay fees for legal or accounting services performed in assuring compliance with applicable election laws, rules or other requirements or in securing, defending, or clarifying the legal rights of candidates.

Election Rules, Art. X, § 1(b)(2). According to the Election Officer, this exception was created to accommodate the Supreme Court's observation in *United Steelworkers v. Sadlowski*, 457 U.S. 102, 119–21, 102 S.Ct. 2339, 2349–50, 72 L.Ed.2d 707 (1982), that a ban on contributions from nonmembers was permissible because it did "not apply where a member uses funds from outsiders to finance litigation."

The rule as promulgated is a reasonable attempt to conform to *Sadlowski*. In that decision, the Supreme Court stated that a rule banning campaign contributions by nonmembers "would clearly violate LMRDA Section 101(a)(4) if it prohibited union members from accepting financial or other support from nonmembers for the purpose of conducting campaign-related litigation." 457 U.S. at 119, 102 S.Ct. at 2349. A blanket ban on outsiders' contributions would, therefore, be unlawful.

The IBT contends that the rule violates LMRDA Section 101(a)(4), which provides that "no interested employer or employer association shall directly or indirectly finance, encourage, or participate" in litigation brought by candidates for union office. *See* 29 U.S.C. § 411(a)(4). We agree with the IBT and remand for purposes of excluding "interested" employers or associations of employers from the provision of the election rules allowing nonmembers to aid candidates in obtaining accounting and legal services. The danger of allowing employers to aid candidates whom they may one day face across a bargaining table is self-evident, and we perceive nothing in *Sadlowski* to the contrary. Unlike the implicit waiver of the LMRDA's prohibition on membership list distribution contemplated by the Consent Decree's authorization to the election officer to supervise elections and distribute materials discussed above, there is no indication in the Consent Decree that the IBT contemplated or consented to a departure from the LMRDA's ban on contributions from interested employers.

Finally, the IBT contends that the exception violates Paragraph 8 of the Consent Decree and Section 401(g) of the LMRDA, which prohibits employer contributions "to promote the candidacy of any person." *See* 29 U.S.C. § 481(g). Although Paragraph 8 does not create an exception for accounting and legal expenses, we deem the Consent Decree to incorporate prevailing legal standards, including the *Sadlowski* decision. With regard to Section 401(g), its general prohibition can be reconciled by reading the phrase "promote the candidacy" as being limited to aiding campaign advocacy and as not including accounting and legal services.

### 4. Campaign Contributions from Foundations

■ The IBT also contends that the election rules improperly permit campaign contributions by foundations. Although the election rules prohibit employer contributions, the definition of "employer" in the rules does not explicitly include foundations. The IBT objects that this rule contravenes Paragraph 8 of the Consent De-

cree, which prohibits campaign contributions from foundations.

The election rules' definition of "employer" includes "any individual, corporation, trust, organization or other entity that employs another." *See* Election Rules, App. § 17. A reasonable construction of this definition viewed in light of Paragraph 8 is that the definition includes foundations. In addition, the election rules incorporate Paragraph 8 of the Consent Decree in its entirety. *See* Election Rules, Art. X, § 1(a). This incorporation of the relevant language from the Consent Decree further supports the conclusion that the Election Officer intends to construe the election rules in a manner consistent with the Consent Decree.

### 5. The Staffing Order

■ The oral Staffing Order approved the Election Officer's request to authorize him to hire regional coordinators and field staff. The IBT contends that the order pre-approves all future hiring decisions of the Election Officer, without regard to the number of personnel, their qualifications, or the amounts they are to be paid. Because we read the Staffing Order considerably less broadly, we affirm.

Paragraph 12(G) of the Consent Decree authorizes the court officers to employ such personnel as are "necessary to assist in the proper discharge of their duties." The Consent Decree also provides a procedure by which the IBT may challenge any expenditures by the court officers. *See* Consent Decree ¶ 12(H) (officers must file expense report every three months; IBT General President has fourteen days to contest the bill, after which time IBT is obligated to pay uncontested expenses). In Application XI, the Election Officer asked the district court to review his proposal to hire twenty-three regional coordinators and "necessary field staff" to assist in the supervision of the IBT elections. The Application noted that twelve regional coordinators had already been hired and described their compensation and qualifications. Observing that the Consent Decree imposes a stringent deadline on the completion of the

court officer's task, the Application sought advance approval to hire the remaining regional coordinators and the proposed field staff. The district court granted the Application and specifically indicated that the approval included future hiring.

We see no bar to the district court's advance approval of staff hiring given the time constraints imposed by the Consent Decree. The IBT has been given an opportunity to be heard on this issue and has offered no grounds justifying our rejection of the district court's order. The order approves and authorizes the hiring of twenty-three regional coordinators, at rates of pay comparable to those of the twelve already hired, and the hiring of necessary field staff. The IBT retains the right under Paragraph 12(H) of the Consent Decree to review expenditures and to apply to the district court for relief if the hiring exceeds that approved by the district court. For this reason, we conclude that the Staffing Order properly implements the court officers' hiring authority under the Consent Decree.

### CONCLUSION

We briefly summarize our holdings. We hold that the IBT, in agreeing to the election provisions of the Consent Decree, adequately represented the interests asserted by the Affiliates. We affirm the Election Rules Order, except that we modify the provisions regarding non-member aid to candidates to obtain accounting and legal services to exclude "interested" employers. We affirm the Staffing Order.