**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, Defendant–Appellant,**

Commission of La Cosa Nostra, et al., Defendants.

Nos. 98–6198, 98–6208.

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1998.

Decided April 8, 1999.

Karen B. Konigsberg, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, New York, N.Y., Andrew W. Schilling and Steven M. Haber, Assistant United States Attorneys, Of Counsel), for Plaintiff–Appellee.

Ronald H. Weich, Washington, D.C. (William W. Taylor, III, Michael R. Smith, Bonnie I. Robin–Vergeer, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, D.C., Of Counsel), for Defendant–Appellant.

David L. Neigus, Office of the General Counsel, International Brotherhood of Teamsters, Washington, D.C., On the Brief, for Defendant–Appellant.

Paul Alan Levy, Public Citizen Litigating Group, Washington, D.C., On the Brief of Teamsters for a Democratic Union as Amicus Curiae Urging Reversal.

Before: VAN GRAAFEILAND and LEVAL, Circuit Judges, and BURNS, District Judge.*

LEVAL, Circuit Judge:

The International Brotherhood of Teamsters ("IBT") appeals from two orders of the United States District Court for the Southern District of New York (David N. Edelstein, *Judge*) that denied the IBT's application to require the United States to pay $8.6 million to fund the rerun of the IBT's 1996 general election. The IBT argues that the government assumed an obligation to pay the full costs of the rerun election through a consent decree and subsequent conduct. We reject this contention and affirm the orders of the district court.

## BACKGROUND

In 1988, the government brought a civil action against the IBT, its leadership, the criminal organization La Cosa Nostra, and others under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (1988). *See United States v. International Broth. of Teamsters ("1991 Election Rules Order")*, 931 F.2d 177, 180 (2d Cir.1991). The complaint alleged that the IBT's leadership had allowed La Cosa Nostra to control the union and its elections through fraud, embezzlement, bribery and extortion. *See id.* The government sought extensive relief, including an injunction against association by IBT leaders with La Cosa Nostra, an order for a new election under government supervision, and appointment of a trustee to run the union pending that election. *See id.*

In March 1989, the government and the IBT entered a consent decree. *See United States v. International Bhd. of Teamsters,* 88 Civ. 4486 (S.D.N.Y. Mar. 14, 1989). The decree enjoined contacts between the IBT and La Cosa Nostra, and amended the IBT constitution to provide for rank-and-file election of top IBT officers. Although the decree did not place the Teamsters in trusteeship, it did provide for three officers, appointed and supervised by the court, to oversee various aspects of the IBT's affairs. The Election Officer, overseen by the Administrator, was empowered to supervise the 1991 IBT general election at IBT expense. With regard to the 1996 election, paragraph 12(D)(ix) of the decree provided: "The union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT elections."

After the completion and certification of the 1991 election, the district court appointed a new election officer to lay the groundwork for the 1996 election. At a June 1993 hearing, the government indicated that because Congress controlled federal funding for the election, there was "a question regarding establishment of a budget ... for the Election Officer" in 1996. On February 7, 1995, the government and the IBT entered a stipulation and order specifying rules for the 1996 election. Because the office of Administrator had ceased to exist, the stipulation provided for an Election Appeals Master to oversee the Election Officer. The stipulation also provided that, subject to limited exceptions, "[t]he authority of the 1996 Election Officer and the Election Appeals Master shall terminate after the certification of the 1996 election results."

Pursuant to the consent decree and stipulation, the government then supervised the first run of the 1996 IBT general election. Incumbent General President Ron Carey and other candidates supported by Teamsters for a Democratic Union (TDU) apparently defeated James P. Hoffa and

---

* The Honorable Ellen B. Burns, Senior United States District Judge for the District of Connecticut, sitting by designation.

his slate. The Election Officer, however, refused to certify the election results, finding that Carey's staff had funneled union funds into his campaign in violation of the election rules. *See United States v. International Bhd. of Teamsters,* 156 F.3d 354, 357 (2d Cir.1998).

The court then approved a plan for a rerun election, with balloting to be completed in November 1997. That rerun was postponed to allow for completion of investigations into both Hoffa's and Carey's conduct. Carey was ultimately disqualified from standing in the rerun election; Hoffa, although fined, was not disqualified. *See United States v. International Bhd. of Teamsters,* 168 F.3d 645 (2d Cir.1999).

Shortly after the Election Officer proposed the rerun election, members of Congress publicly stated that the United States should not pay for a rerun election. *See, e.g.,* 143 Cong. Rec. S8803 (Sept. 4, 1997) (statement of Sen. Lott). In September 1997, staff from the congressional appropriations committees advised the Department of Justice not to spend any outstanding appropriations for the 1996 election on the rerun. Following what the government describes as a "longstanding policy," the Department deferred to this request. In November 1997, Congress enacted provisions in two appropriations bills containing prohibitions on funding of supervision from sums provided in those acts. *See Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act,* P.L. 105–78, § 518, 111 Stat. 1467, 1519 (1997); *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act,* P.L. 105–119, § 619, 111 Stat. 2440, 2519 (1997). The government then instructed the Election Officer not to pay the costs of the rerun election with Department of Justice appropriations.

The government then sought to require the IBT to pay the full costs of the rerun election on the ground that the IBT's misconduct necessitated the rerun. Although the district court accepted this view and ordered the IBT to pay the costs of the rerun, we reversed. *See United States v. International Bhd. of Teamsters,* 141 F.3d 405 (2d Cir.1998) (*"Rerun Funding I"*). We ruled that under the Consent Decree, "if the government chooses to supervise the 1996 elections, of which the rerun is conceded to be a part, the government [must] bear the cost." *Id.* at 406–07. Because the government had at that point "exercised [its] option" to supervise the election, and because the misconduct necessitating the rerun was not attributable to the IBT, we held that the IBT could not be required to fund the costs of supervising the rerun election. *Id.* at 407, 409.

In June 1998, the Election Officer sought an order compelling the parties to agree to a plan to secure funding for the rerun election. In response, the IBT supported a supervised election fully funded by the government, but stated that, alternatively, the government could make a "choice" to let the IBT conduct an unsupervised election. The government stated that it would continue to seek funds to supervise the rerun election. If such funding were not available, the government indicated that it would "expect to inform the Court that it will not be able to exercise its option to have supervision of the rerun by the Election Officer."

In July, the IBT for the first time argued that the government "already [had] exercised its option [to supervise the rerun election] ... [and] should be ordered to fulfill its resulting funding obligation." The government advised the court that it should make contingency plans for an unsupervised election in the event funding were unavailable. *See* Government's Memorandum of Law in Reply to the IBT's Supplemental Response to Election Officer Application XIX, and in Support of the Government's Application for Approval of a Proposed Rerun Election Plan, at 3 (stating that "the Government's plan envisions that the IBT will conduct and supervise the rerun election"). On July 28, the IBT applied for an order "requiring the

United States to fund supervision of the rerun election and for entry of judgment against the United States in the amount of $8,601,620," the cost of supervision projected in the Election Officer's most recent budget. The government replied that it could not be compelled to pay the costs of a rerun election.

Before the district court decided on the IBT's motion, the Department of Justice informed the court that, with approval from congressional appropriators, the government could provide $4.017 million for a supervised rerun election, if the Teamsters would supply an equal amount. The Teamsters declined to provide any funding, arguing the government should pay. The government indicated that, without some voluntary contribution from the Teamsters, a supervised election might be impossible.

On August 20, the district court issued the order that is the subject of this appeal, denying the IBT's application to order the United States to provide $8.6 million in election funding. Judge Edelstein explained, *inter alia*, that nothing in the consent decree or our *Rerun Funding I* decision suggested that the government had entered a "binding obligation to pay for the rerun election."

While appealing the district court's decision, the IBT agreed to contribute $2 million toward the costs of a supervised election. The Election Officer then proposed a new election plan and timetable on a $6 million budget. In response, the IBT told the district court that the timetable "should be approved quickly," while also restating that the election should be fully funded by the government. After the district court approved the new timetable, the IBT appealed from the approval, seeking "to obtain additional funds for use by the Election Officer to supervise the IBT rerun election."

In late 1998, the IBT held its general election for the top offices of the Teamsters. We consolidated the IBT's appeals.

## DISCUSSION

The IBT argues that the district court should have required the government to pay the full costs of funding the rerun election. The government makes three claims in response: (i) the IBT's contribution to the election costs mooted the dispute; (ii) the government had no obligation to fund the rerun election; and (iii) even if the government did have such an obligation, nonetheless the court cannot properly compel the government to supply such funding. We disagree with the government's first contention, agree with its second, and therefore do not reach its third.

### 1. Mootness

The government contends that the parties have voluntarily "settled" their dispute, because the IBT contributed funding to the conduct and supervision of the election. The government claims there is therefore now no "case or controversy." We disagree.

Although a settlement that resolves all disputes moots a lawsuit, *see, e.g., Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co.,* 638 F.2d 7, 8 (2d Cir.1980), there was no settlement. There was no agreement. And the IBT's contribution to election supervision was made under protest, reserving the right to appeal the district court's refusal to order government funding for supervision.

"A case becomes moot only when it is 'impossible for the court to grant *any* effectual relief whatever to a prevailing party.'" *In re Boodrow,* 126 F.3d 43, 46 (2d Cir.1997) (quoting *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)) (internal citations and quotation marks omitted). In this case, the IBT can obtain effectual relief. If the IBT were to prevail, the government would be required to pay the balance of the $8.6 million that the government has not already paid. That sum

would be available to fund any continuing activities of the Election Officer or to recoup the IBT's contribution to the election costs. Accordingly, the IBT can still obtain effectual relief.

We do agree with the government that the IBT, in supporting the final proposed timetable, waived any appeal from the order approving that timetable. In so doing, however, the IBT did not abandon its claim that the government should fully fund the election, nor did it abandon its appeal of the district court's earlier decision not to require such funding. The first appeal therefore has not been waived, and it presents a live controversy.

### 2. The Merits

The IBT argues that, as of July 1998, the government had an obligation to continue supervising and funding the rerun election. As putative sources of this obligation, the IBT points to the 1988 consent decree, the 1995 stipulation, and the government's failure to seek termination of election supervision. The district court concluded that the consent decree did not bind the United States to supervise the rerun election. Reviewing the district court's interpretation de novo, and construing the consent decree "basically as [a] contract[ ]," Rerun Funding I, 141 F.3d at 408 (internal citations and quotation marks omitted), we find that the government bore no obligation to supervise and fund the rerun election.

We disagree with the IBT's interpretation of the consent decree. The key provision reads: "The union defendants consent to the Election Officer, at Government expense, to supervise the 1996 IBT elections." As we said in our Rerun Funding I decision, this provision gave the government the right to require supervision of the 1996 election; if the government exercised that right, the provision required the government to bear the costs of supervision. See id. Supervision of the election was an option of the government. Noth-

ing in the consent decree required the government to supervise the 1996 election if the government did not wish to do so. As the government was not required to supervise the rerun election if it chose not to do so, it was not required to pay for the election.

The IBT contends that, although supervision of the 1996 election was once at the government's option, the government irrevocably exercised that option by entering the 1995 stipulation and supervising the first election run. (We note that the IBT took a different position as recently as June 1998, saying the government could make a "choice" whether to supervise the election.) There is no support in the consent decree or stipulation for the IBT's current claim. The only requirement imposed on the government by the decree was to fund the election if the government chose to supervise. In neither the decree nor the stipulation did the government undertake that, having elected to supervise and fund an initial 1996 election, it would be required to supervise and fund any necessary rerun.

Our decision in Rerun Funding I is not to the contrary. When we said the government had "exercised [its] option" to fund a rerun election that was a part of the 1996 election, see id. at 407, the question whether that option was irrevocable was not before us. At the time, the government vigorously supported supervision, and the only question was whether the government could require supervision without paying for it. In answering that question in the negative, we did not need to decide, and did not decide, if or when the government might withdraw from supervision and payment. See id. at 409 ("We express no opinion as to ... whether the IBT may under different circumstances be responsible for [supervision] costs.").

It is also irrelevant that the government never formally sought to withdraw from supervising the rerun election. The con-

sent decree and stipulation did not require the government to withdraw from supervision by a certain date. Nor did the government ever state that it was irrevocably opting for supervision. After our *Rerun Funding I* decision, the government instead made clear that it would not supervise the rerun election without funding. Before the $4 million became available, the government sought to delay an end to supervision, while also proposing a plan for an unsupervised election. After the $4 million became available, the government encouraged the IBT to provide the balance of funding necessary for supervision, but again indicated that an unsupervised election might be necessary if the IBT chose not to volunteer funds. In August 1998, the government thus had not definitively opted to supervise the rerun election, and the district court properly did not order the government to fund such supervision.

Finally, the fact that the IBT ultimately contributed to the costs of a supervised election does not mean that the government violated the consent decree. Requiring the IBT to contribute would have breached the decree; but that is not what happened. The government merely encouraged the IBT to contribute to a supervised election. The government did not violate the consent decree when the IBT chose to contribute.

It may be true that the government's withdrawal from supervision last summer would have risked retarding the IBT's progress toward democracy, a central goal of the consent decree. But the consent decree did not require the government to take steps the IBT did not bargain for, just because such steps would advance the goals of the decree. If the IBT had wanted to require the government to supervise and pay for the 1996 election, the IBT

might have bargained for a provision imposing such a requirement. As it stands, the consent decree imposes no such obligation on the government.

We have considered appellant's other arguments and find them to be without merit.

## CONCLUSION

The judgment of the district court is affirmed.