998 F.2d 1101
 143 L.R.R.M. (BNA) 2916
 UNITED STATES of America, Plaintiff-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO; The
Commission of La Cosa Nostra; Anthony Salerno, also known
as Fat Tony; Matthew Ianniello, also known as Matty the
Horse; Anthony Provenzano, also known as Tony Pro; Nunzio
Provenzano, also known as Nunzi Pro; Anthony Corallo, also
known as Tony Ducks; Salvatore Santoro; Christopher
Furnari, Sr., also known as Christie Tick; Frank Manzo;
Carmine Persico, also known as The Snake, also known as
Junior; Gennaro Langella, also known as Gerry Lang; Philip
Rastelli, also known as Rusty; Nicholas Marangello, also
known as Nicky Glasses; Joseph Massino, also known as Joey
Messina; Anthony Ficarotta, also known as Figgy; Eugene
Boffa, Sr.; Francis Sheeran; Milton Rockman, also known as
Maishe; John Tronolone, also known as Peanuts; Joseph John
Aiuppa, also known as Joey Aiuppa, also known as Joe Doves,
also known as Joey O'Brien; John Phillip Cerone, also known
as Jackie Cerone, also known as Jackie the Lackie; Joseph
Lombardo, also known as Joey the Clown; Angelo Lapietra,
also known as Nutcracker, The; Frank Balistrieri, also
known as Mr. B; Carl Angelo DeLuna, also known as Toughy;
Carl Civella, also known as Corky; Anthony Thomas Civella,
also known as Tony Ripe; General Executive Board,
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America; Jackie Presser,
General President; Weldon Mathis, General
Secretary-Treasurer; Joseph Trerotola, also known as Joe
T, First Vice President; Robert Holmes, Sr.,
Second Vice President; William J. McCarthy, Third Vice
President; Joseph W. Morgan, Fourth Vice President; Edward
M. Lawson, Fifth Vice President; Arnold Weinmeister, Sixth
Vice President; John H. Cleveland, Seventh Vice President;
Maurice R. Schurr, Eighth Vice President; Donald Peters,
Ninth Vice President; Walter J. Shea, Tenth Vice President;
Harold Friedman, Eleventh Vice President; Jack D. Cox,
Twelfth Vice President; Don L. West, Thirteenth Vice
President; Michael J. Riley, Fourteenth Vice President;
Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis,
Sixteenth Vice President; Salvatore Provenzano, also known
as Sammy Pro, Former Vice President, Defendants,
International Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of America, AFL-CIO,
Defendant-Appellant.
 No. 1140, Docket 92-6254.
 United States Court of Appeals,
Second Circuit.
 Argued March 11, 1993.
Decided July 15, 1993.
 
 Steven C. Bennett, Asst. U.S. Atty. (Mary Jo White, U.S. Atty. for the S.D.N.Y., Christine H. Chung, Gabriel W. Gorenstein, Asst. U.S. Attys., of counsel), for appellee.
 Richard M. Seltzer (Richard N. Gilberg, Stephen Presser, Cohen, Weiss & Simon, New York City, Earl V. Brown, Jr., Washington, DC, of counsel) for defendant-appellant.
 Andrew D. Roth, (Bredhoff & Kaiser, Washington, DC, Walter Kamiat, Laurence Gold, Washington, DC, of counsel) filed a brief amicus curiae on behalf of AFL-CIO.
 Before MAHONEY, WALKER, Circuit Judges, and SAND, District Judge.*
 WALKER, Circuit Judge:
 
 
 1
 In this interlocutory appeal we are asked to review rules governing the operation of an Independent Review Board ("IRB") established pursuant to the Consent Decree entered into between the government and the defendants in this action. The Consent Decree established the IRB to oversee the eradication of corruption in the International Brotherhood of Teamsters (the "IBT") in the Consent Decree's final phase. The IBT appeals from an order of the United States District Court for the Southern District of New York (David N. Edelstein, Judge ), approving the government's proposed rules with certain modifications. United States v. IBT, 803 F.Supp. 761 (S.D.N.Y.1992). The IBT asserts on appeal that a number of the rules are inconsistent with the Consent Decree and should not have been approved by the district court. While we determine that most of the rules fall within the scope of the Consent Decree, we agree that four of them as written do not.
 
 BACKGROUND
 
 2
 The history of this case has been recounted by this court numerous times in the last several years, see, e.g., United States v. IBT, ("Election Rules Order"), 931 F.2d 177, 180-81 (2d Cir.1991), and is described in detail in Judge Edelstein's exhaustive opinion below.
 
 
 3
 The Consent Decree was entered by the district court on March 14, 1989, settling the civil action brought by the government in June, 1988 under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, against the IBT, its General Executive Board (the "GEB"), the GEB's individual members, the Commission of La Cosa Nostra criminal organization, and numerous reputed members of La Cosa Nostra. The provisions of the Consent Decree have been summarized in our prior opinions, see, e.g., Election Rules Order, 931 F.2d at 180-81; United States v. IBT ("Friedman & Hughes"), 905 F.2d 610, 612-13 (2d Cir.1990), and only those provisions relevant to this appeal need be reiterated.
 
 
 4
 The decree, in addition to permanently enjoining the defendants from committing any racketeering activity or knowingly associating with members of organized crime, set up various mechanisms to cleanse the union of the influence of organized crime. As set forth in the decree, the first phase was supervised by three court-appointed officers: an Investigations Officer, an Independent Administrator, and an Elections Officer. The Investigations Officer was vested with the authority to investigate misconduct, initiate disciplinary actions against IBT officers, members, employees, and affiliates, and, where necessary, institute trusteeship proceedings over IBT local unions and other affiliates. The Investigations Officer also was empowered to prosecute disciplinary actions before the Independent Administrator. The Independent Administrator, in addition to ruling on cases brought by the Investigations Officer, oversaw the implementation of the Consent Decree generally. It was the responsibility of the Elections Officer to supervise rank-and-file elections of delegates to the IBT Convention in 1991 followed by rank-and-file elections of IBT officers from among the candidates nominated at the Convention. Under § B(3)(3) of the Consent Decree, after the certification of the 1991 election by the Elections Officer, the authority of these three court officers ceases and their functions are taken over by the IRB. On January 22, 1992, the Elections Officer certified the 1991 election, triggering the IRB phase of the Consent Decree.
 
 
 5
 Section G of the Consent Decree sets forth the structure of the IRB and the scope of its authority. See 803 F.Supp. at 768-69. It consists of three members, one chosen by the IBT, one chosen by the Attorney General of the United States, and a third chosen by the first two. The Consent Decree endows the IRB with broad authority to hire investigators and attorneys to investigate "any allegations of corruption," "any allegations of domination or control or influence of any IBT affiliate, member or representative" by organized crime, or any failure of the IBT, members, and affiliates to cooperate with the IRB. Consent Decree § G(a). The Consent Decree also states that the IRB "shall exercise such investigative authority as the General President and General Secretary-Treasurer are presently authorized and empowered to exercise pursuant to the IBT Constitution...." Consent Decree § G(b). Upon completing an investigation, the IRB is to issue a written report of its findings and refer matters to the appropriate IBT entity for action. Consent Decree §§ G(d) and (e). The IBT entity then must provide a written report to the IRB outlining its disposition of the matter, and the IRB in turn is to issue a written determination of the adequacy of the IBT entity's response. Consent Decree § G(g). If the IRB finds the response to be unsatisfactory, then the IRB is to hold an evidentiary hearing to be conducted "under the rules and procedures generally applicable to labor arbitration hearings," Consent Decree § G(g), and "issue a written decision." Consent Decree § G(h). As the district court noted, "[i]n sum, Section G of the Consent Decree empowers the IRB to eradicate corruption in the IBT on its own initiative and to monitor IBT efforts to purge corruption in the Union." 803 F.Supp. at 769.
 
 
 6
 On July 17, 1992, the government made the instant application proposing specific rules to govern the operation of the IRB and its staff. It made this application to the district court pursuant to § K of the Consent Decree, which provides that "[t]his Court shall retain jurisdiction to supervise the activities of the Administrator and to entertain any future applications by the Administrator or the parties." The court approved the rules as set forth in Exhibit A of its opinion, 803 F.Supp. at 800-806. IBT appeals, challenging rules D(2), E(2) and (3), F(1), (2) and (5), H(3)(b), (3)(e), (6) and (7), N(2), and O.
 
 DISCUSSION
 A. Court Interpretation of Consent Decrees
 
 7
 Consent decrees, while they are judicial decrees subject to enforcement by the court, nonetheless are agreements between parties to litigation that "should be construed basically as contracts." United States v. ITT Continental Baking Co., 420 U.S. 223, 236-37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). Consent decrees are "entered into by parties to a case after careful negotiation has produced agreement on their precise terms," and therefore "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). However, a court also may consider, as it would in construing a contract, normal aids to construction such as "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." ITT Continental Baking, 420 U.S. at 238, 95 S.Ct. at 935.
 
 
 8
 B. IBT's Objections to the Challenged Rules Generally
 
 
 9
 IBT argues that the district court, in approving the challenged rules, improperly treated the Consent Decree as an organic document giving the court broad authority to fashion rules to fulfill its purpose. While we agree that parts of two of the rules cannot be found in the four corners of the Consent Decree, and believe it necessary to clarify certain others to ensure that they are applied in a manner consistent with the decree, we reject the IBT's argument as to most of the challenged rules.
 
 
 10
 The section of the Consent Decree pertaining to the IRB, consisting of four and a half double-spaced pages, paints with a broad brush. It is plain to us that the IRB would be unable to function absent either court-approved rules governing its operations or a vesting in the IRB of broad discretion to interpret the Consent Decree and develop its own modus operandi on a case-by-case basis. We believe that the latter course is inappropriate for at least the reason that it would deprive the parties of advance notice of how the IRB will operate. We agree with the district court that rules are necessary and that the authority of the court to approve rules governing the IRB is within a fair reading of the Consent Decree.
 
 
 11
 The IBT claims that even if the challenged rules are necessary for the IRB to function effectively, they are not authorized by the Consent Decree and therefore cannot be permitted. But the Consent Decree states that the IRB "shall exercise such investigative authority as the General President and General Secretary-Treasurer are presently authorized and empowered to exercise ...," § G(b), and shall "have the authority to review any disciplinary or trusteeship decision of the General Executive Board...." § G(k). In these provisions, the drafters of the Consent Decree chose broad grants of authority, rather than narrow, carefully circumscribed prescriptions. These provisions, central to the IRB section of the Consent Decree, would be a dead letter, as would be the Consent Decree itself in this final phase, if the IRB's powers were given the strict reading urged by the IBT and the district court was deprived of room to fashion rules based on the terms of the Consent Decree.
 
 
 12
 Moreover, § K of the Consent Decree states that the district court "shall retain jurisdiction to supervise the activities of the Administrator and to entertain any future applications by the Administrator or the parties." The district court previously has held that this section "is broad enough to warrant the court to consider prospective matters that may threaten the letter, spirit and intent of this Decree." United States v. IBT, 764 F.Supp. 787, 791 (S.D.N.Y.), aff'd without opinion, 940 F.2d 648 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 76, 116 L.Ed.2d 50 (1991). In the Election Rules Order appeal, we upheld, with minor modification, the court's approval of rules proposed by the Elections Officer that facilitated the implementation of the Consent Decree's election provisions. Election Rules Order, 931 F.2d 177, aff'g 742 F.Supp. 94, 98 (S.D.N.Y.1990). Just as court-approved rules governing the elections were necessary to the exercise of the authority and duties given to the Elections Officer by § K of the Consent Decree, so too are rules necessary to permit the IRB to operate and thereby effectuate the basic functions delegated to it by § G.
 
 
 13
 However, rules that are necessary to enable the IRB to fulfill the specific duties and functions given to it by the Consent Decree must not be confused with rules that merely seem desirable to the court or which might be a better way for the IRB to fulfill its purpose than the ways set forth in the Consent Decree. A court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals. See United States v. O'Rourke, 943 F.2d 180, 189 (2d Cir.1991) (courts are forbidden to "rewrit[e a] Decree to conform with the court's perception of the parties' intent").
 
 
 14
 With the foregoing principles in mind, we turn to an examination of each of the challenged rules.
 
 C. The Challenged Rules
 
 15
 1. Rule D(2): Meetings and Decisions of the IRB
 
 
 16
 Rule D(2) sets forth the quorum and voting procedures of the IRB. 803 F.Supp. at 801. The IBT challenges two parts of Rule D(2). First, it challenges the portion of the rule stating that "[o]ne IRB member, with the consent of the other two, may be authorized to conduct a hearing ... and issue a written decision on any matter." Id. The district court approved this provision on the basis that it would enable the IRB to pursue disciplinary matters vigorously in the way that the entire IRB decides is "the best course of action." 803 F.Supp. at 795. While we do not disagree that the IRB is free to decide what the best course of action is in exercising the various functions given to it by the Consent Decree, it still is constrained by the decree. The IRB may neither create functions not in the decree nor ignore those that are. The parties' negotiated "best course of action" expressly embodied in the decree cannot be subordinated to another "best course of action" determined by the IRB.
 
 
 17
 The Consent Decree specifies in § G(h) that after a hearing "the Independent Review Board shall issue a written decision ..." (emphasis added). Yet Rule D(2) permits an individual IRB member to issue a decision, albeit with the prior authorization of the other two members. The district court found this to be within the spirit of the Consent Decree since this delegation of decision-issuing authority may only be utilized with the IRB's unanimous consent. To be sure, the unanimous consent provision would tend to prevent abuses of this single-member decision authority, and would ensure that it could not be used to alter the balance of power among the three board members. However, the district court in approving this procedure disregarded the fact that the Consent Decree's drafters were specific in providing that written decisions were to be issued by the IRB, which we take to mean the full board. Perhaps the drafters saw a value in having joint panel deliberation, or in having three panel members, each with individual styles and background experiences, approach a case independently. Whatever their rationale, we need go no further than the decree's express language stating that it is the full three-member board that issues decisions.
 
 
 18
 We do not agree with the IBT, however, that the provision of Rule D(2) that allows a single judge to hold a hearing upon unanimous consent falls outside the scope of the Consent Decree. Section G(g) of the Consent Decree states only that where the IRB issues a written report of an investigation, and the IRB subsequently "concludes that the IBT entity involved has failed to take or propose satisfactory action to remedy the defects specified by the Independent Review Board's notice, the Independent Review Board shall promptly convene a hearing, after notice to all affected parties." It does not state that each hearing must be conducted by the entire IRB, only that the full board must "convene a hearing." Designating by unanimous consent a single IRB member to hold a hearing is a reasonable interpretation of the decree's requirement that the IRB "convene a hearing." We therefore approve the rule insofar as it permits, upon unanimous IRB consent, a single IRB member to preside over hearings and to issue a recommended decision. However, we hold that before such a decision shall be effective, it must be adopted by a majority of the full board.
 
 
 19
 The IBT also challenges the second part of Rule D(2), which provides that where there is a deadlock on the IRB and "the third member fails or refuses to vote on the matter, the matter shall be referred to [the District Court] for final disposition." 803 F.Supp. at 801. We believe that this rule is necessary to ensure the efficacy of the Consent Decree's final phase as set forth in § G, which makes a strong IRB the central mechanism for achieving the decree's goals of eradicating corruption and misconduct. Rule D(2) also is grounded in § A of the decree, which states that the district court "shall retain jurisdiction over this case until further order of the Court," and § K, which states that the Court "shall retain jurisdiction ... to entertain any future applications by ... the parties."
 
 2. Rules E(2) and (3): IRB Staff
 
 20
 The IBT objects to Rule E(2), which provides that "[e]ach IRB member may employ personal staff, including but not limited to secretaries and attorneys, to assist them in the performance of their functions." 803 F.Supp. at 801. The IBT argues that the provisions of the Consent Decree stating that "[t]he Independent Review Board shall be authorized to hire a sufficient staff of investigators and attorneys ...," § G(a), and that "[t]he IBT shall pay all costs and expenses of the Independent Review Board and its staff," § G(l ), are necessarily limited to a central IRB staff, and not personal staffs of IRB members. However, we see no basis for such a restrictive view of "staff." A construction that enables each IRB member to have his own staff to assist in holding hearings, conducting investigations, and issuing decisions furthers the independence of each member, a goal wholly consistent with the decree's establishment of a three-member board. Moreover, without individual staffs to help IRB members prepare for hearings and write decisions, as well as assist with administrative tasks like scheduling and communicating with the other two members, the effectiveness of the IRB would be severely impaired, thereby frustrating the fulfillment of its purpose of identifying, investigating and disciplining misconduct. We therefore reject the IBT objection to private staffs.
 
 
 21
 The IBT makes a similar challenge to Rule E(3), which allows each IRB member to designate an assistant, with the consent of the other IRB members, to "act on the member's behalf and to aid in carrying out the IRB member's duties." We reject this challenge as well. The designation of an assistant is consistent with the Consent Decree's authorization of IRB support staff. We note, however, that this rule does not permit an assistant or other staff member to supplant the IRB member where a vote of the IRB is required, such as in issuing written reports of investigations pursuant to § G(d), issuing a determination of adequacy of IBT action under § G(f), or issuing decisions after a hearing pursuant to § G(h). Such actions must be taken by the IRB members themselves.
 
 
 22
 3. Rules F(1), (2) and (5): Salaries and Finances
 
 
 23
 The IBT objects to three of the rules regarding the salaries paid to IRB members and staff: Rule F(1), which states that the IBT shall pay the salaries of the staffs of the IRB and its members; Rule F(2), which sets forth the method of calculating the salaries of the three IRB members; and Rule F(5), which sets forth the benefits to be given to the IRB members and staff. 803 F.Supp. at 801-02. The IBT objects to Rules F(1) and F(5) insofar as they provide wages and benefits for staff members working for individual IRB members. However, since the Consent Decree specifically states that "[t]he IBT shall pay all costs and expenses of the Independent Review Board and its staff (including all salaries of Review Board members and staff)," Consent Decree § G(1), and because we hold that the Consent Decree authorizes the hiring of staff for individual IRB members, we reject the IBT's contention.
 
 
 24
 The IBT also challenges the salary formula for IRB members set forth in Rule F(2), under which each IRB member is to be paid according to billable hours at the member's customary rates, subject to a compensation floor of $100,000 per year. 803 F.Supp. at 801. The IBT argues that this salary formula results in excessive compensation not contemplated by the Consent Decree.
 
 
 25
 By signing the Consent Decree, the IBT agreed to pay "all costs and expenses of the Independent Review Board." Consent Decree § G(1) (emphasis added). While this provision could be read to authorize whatever compensation the IRB wished to give itself, we agree with the district court that a rule setting forth the compensation levels of the IRB members is necessary. We also agree with the district court that a $100,000 guaranteed minimum salary is necessary to attract and retain highly qualified individuals as board members, and that the members should be compensated at an hourly rate that is fair and reasonable for the hours they devote to the IRB. However, we do not agree with the district court that those IRB members who have a normal hourly billing rate, such as those who are attorneys in private practice, necessarily should be compensated at their normal rates. A substantial portion of a private attorney's fee covers unbilled overhead such as the wages and benefits of secretarial and other support staff, rent, and library expenses. To the extent that these costs already are being borne by the IBT in providing the IRB office space and support staff, any compensation based upon the normal hourly rate of an IRB member must be reduced accordingly.
 
 
 26
 4. Rules H(3)(b), (3)(e), (6) and (7): Investigations
 
 
 27
 Rule H sets forth the scope of the IRB's investigative authority, and lists the various investigative tools which "[t]he IRB's authority shall include, but not be limited to...." 803 F.Supp. at 802. The IBT objects to Rule H(3)(b), which provides that the IRB shall have the authority "[t]o receive, no less than one week prior to any meeting of the GEB, the agenda for the meeting, and to attend meetings or portions of meetings of the GEB that relate in any way to the rights, duties or activities of the IRB." Id. at 802. The IBT also objects to Rule H(3)(e), which gives IRB members the authority "[t]o attend meetings of any affiliated body of the International Union." Id. at 803. While acknowledging that § G(b) of the Consent Decree specifically gives the IRB the same investigative power as the IBT General President and General Secretary-Treasurer, the IBT argues that Rules H(3)(b) and (e) "cede to the IRB the equivalent of the political, executive, and administrative authority of the General President to supervise and stay fully informed about IBT operations." We disagree. The authority to receive agendas and attend meetings of the GEB and to attend meetings of affiliated bodies, while certainly falling within the political, executive, and administrative authority of the IBT General President and General Secretary-Treasurer, also falls within their investigative power. The fact that there is an overlap between their investigatory power, which the Consent Decree grants to the IRB, and their other powers, which the decree does not give to the IRB, is irrelevant. We therefore uphold Rules H(3)(b) and (e).
 
 
 28
 Rule H(7) gives the Chief Investigator, a position created by Rule E(1), the same investigatory power pursuant to Rule H as given to the IRB. Id. at 803. The district court found that the appointment of a Chief Investigator, with authority to act as a prosecutor in conducting investigations and presenting charges at IRB hearings, was within the Consent Decree's authorization of the hiring of "a sufficient staff of investigators ...," Consent Decree § G(a). See 803 F.Supp. at 782. The district court noted that "without a Chief Investigator, the IRB would ... have to adopt a prosecutorial stance at disciplinary hearings." Id. While the IBT does not challenge the existence of the position of Chief Investigator, it seeks to deny it the authority to investigate. In light of the Consent Decree's broad grant of investigative authority to the IRB, and its authorization to hire investigators, Rule H(7)'s delegation of the various investigative powers set forth in Rule H to the Chief Investigator is fully consistent with the decree. We note, however, that functions specifically delegated to the IRB, such as the issuance of an investigation report and recommendation at the conclusion of an investigation pursuant to § G(d) ("Upon completion of an investigation, the Independent Review Board shall issue a written report detailing its findings, charges, and recommendations...."), and the issuance of notice to the IBT that its response to a report is inadequate under § G(f), remain the exclusive province of the IRB itself. Of course, this does not prevent the Chief Investigator from submitting recommendations and draft reports and notices upon which the IRB may act.
 
 5. Rule N(2): Communications
 
 29
 Rule N(2) provides: "The IRB shall have the authority to distribute materials to the membership of the IBT (including but not limited to copies of these Rules), as necessary to further the IRB's activities. The IRB shall have the authority to publish materials, including a report, in each and every issue of The New Teamster concerning the activities of the IRB." 803 F.Supp. at 805.
 
 
 30
 The IBT argues that since the Consent Decree specifically states in § G(d) that IRB investigation reports "shall be available during business hours for public inspection at the IBT office in Washington, D.C.," and since § G(h) provides that written decisions of the IRB shall be distributed to the General President, members of the GEB, and affected parties, the Rule's authorization of further dissemination of IRB materials constitutes an expansion of IRB authority beyond that granted in the Consent Decree. However, we read §§ G(d) and (h) as giving rights to various IBT officials, affected parties, and the public to have access to IRB materials and to receive copies of decisions. These provisions do not purport to define the extent of the IRB's authority to disseminate its decisions and other materials as it deems appropriate.
 
 
 31
 The Consent Decree states that where the IRB is dissatisfied with the IBT's implementation of its decisions it "shall have the authority to take whatever steps are appropriate to insure proper implementation of any such decision." Consent Decree § G(j). This provision supports Rule N(2)'s grant of authority to the IRB to disseminate information regarding its decisions. The authority of the IRB to disseminate information regarding investigations and other pre-hearing materials derives from the broad grant of investigatory power to the IRB in § G(b) of the Consent Decree. In conducting an investigation, it is possible that the IRB will find it helpful to report its activities to the IBT membership in order to elicit information from members who may have information that would assist it. We are unwilling to hamstring the IRB by denying it the ability to communicate with the IBT membership as it sees fit in conducting its investigations.
 
 
 32
 The IBT's objection to the dissemination of information by officers acting pursuant to the Consent Decree via The New Teamster, as opposed to other means of dissemination, has previously been rejected by this court. See Election Rules Order, 931 F.2d at 187-88.
 
 
 33
 However, we think that Rule N(2) gives the IRB power beyond the scope of the Consent Decree in stating: "The IRB shall have the authority to publish materials, including a report, in each and every issue of The New Teamster, concerning the activities of the IRB" (emphasis added). The Consent Decree authorizes publication and other distribution of materials to facilitate the implementation of the IRB's decisions or the conducting of an investigation. Publication and distribution of materials by the IRB must have some nexus with these two functions. While we think that the IRB should have broad discretion to decide when distribution of materials to the IBT membership is necessary to ensure the implementation of a decision or the conducting of an investigation, and what form it should take, Rule N(2)'s grant of authority to publish in every issue of The New Teamster, regardless of the reason, cannot be found in a fair reading of the Consent Decree. We also think that the first sentence of Rule N(2), giving the IRB authority to distribute materials to the IBT membership "as necessary to further the IRB's activities" does not convey specifically enough what is authorized by the Consent Decree. Rule N(2) may grant the IRB the authority to distribute materials to the membership of the IBT, and to publish materials in The New Teamster, but only as necessary to facilitate its investigations and ensure the proper implementation of its decisions.
 
 6. Rule O: Applications
 
 34
 Rule O permits the IRB or any IRB member to make applications to the district court "at any time and for any reason that touches upon any aspect of the IRB...." The genesis of this Rule lies in § A of the Consent Decree, which gives the district court continuing jurisdiction over the action until further order of the court, and § K, which provides for applications to the court by the Administrator or the parties. Rule O provides a necessary mechanism to ensure the implementation of the Consent Decree in the event of non-compliance by the IBT with its terms, refusal of an IRB member to convene a hearing, or any other event that threatens it.
 
 
 35
 The IBT urges us to reject any authorization of IRB members to apply individually to the district court, on the theory that § K of the decree specifically mentions "the Administrator or the parties," and the omission of any mention of the IRB in § K indicates an intent by the drafters not to allow any such applications by IRB members. Since we find that allowing application by IRB members falls within § A's statement that the court shall retain continuing jurisdiction over the case, and within § G's contemplation of a powerful IRB, we reject this argument. However, as we stated in our discussion of Rule D(2) above, the Consent Decree designed the IRB to function as a three-member panel. We therefore think that applications to the court must ordinarily be made by the IRB as a body, and that the rule is inconsistent with the Consent Decree. However, we recognize that unusual circumstances may arise that would necessitate permitting application by a single IRB member. Accordingly, a rule permitting application to the district court by a single member upon a showing of compelling circumstances would be consistent with the Consent Decree.
 
 CONCLUSION
 
 36
 The district court's approval of Rules E(2), E(3), F(1), F(5), H(3)(b), H(3)(e), H(6), and H(7), is hereby affirmed, as qualified by the discussion above. The district court's approval of Rules D(2), F(2), N(2) and O is affirmed in part and reversed in part, as set forth above. We remand this case to the district court for further proceedings consistent with this opinion.
 
 
 37
 The parties shall bear their own costs.
 
 
 
 *
 Hon. Leonard B. Sand, United States District Court for the Southern District of New York, sitting by designation