347 F.3d 419
 Alicia PEREZ, M.D., Joseph Tuggle, M.D., Diana Lippi, M.D., and Complete Newborn Care, P.C., Plaintiffs-Appellees,
v.
DANBURY HOSPITAL and Danbury Office of Physician Services, P.C., Defendants-Appellants.
 Docket No. 02-9450(L).
 Docket No. 02-9479(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: September 10, 2003.
 Decided: October 21, 2003.
 
 COPYRIGHT MATERIAL OMITTED Kevin D. McDonald, Edwin L. Fountain, Jonathan Berman, Jones, Day, Reavis & Pogue, Washington, D.C., for Defendants-Appellants-Cross-Appellees.
 Frank J. Silvestri, Jr. Robert M. Frost, Jr., Zeldes, Needle & Cooper, P.C., Bridgeport, CT, for Plaintiffs-Appellees-Cross-Appellants.
 Before: McLAUGHLIN, JACOBS, and POOLER, Circuit Judges.
 McLAUGHLIN, Circuit Judge.
 Defendants, Danbury Hospital (the "Hospital") and its for-profit subsidiary, Danbury Office of Physicians Services ("DOPS"), appeal from an order of contempt entered by the United States District Court for the District of Connecticut (Dorsey, J.). The district court determined that Danbury Hospital had violated a 1994 consent decree (the "Decree") entered into with the individual plaintiffs and their private neonatology practice group, Complete Newborn Care, P.C. ("CNC"), after the parties settled an antitrust action. As part of the contempt order, the district court enjoined the Hospital from involving obstetricians in the process of obtaining patients' designation of neonatologists. It also awarded plaintiffs $86,900 damages.
 On appeal, Danbury Hospital and DOPS argue that the contempt order should be vacated because: (1) plaintiffs' claims were barred by laches, res judicata, and collateral estoppel; (2) the district court's factual findings were clearly erroneous; and (3) the finding of contempt and the issuance of an injunction were an abuse of discretion. Plaintiffs cross-appeal, claiming that a special master should be appointed if the injunction is vacated.
 
 
 1
 Although defendants' procedural defenses and their allegation that the court's factual findings are clearly erroneous lack merit, we find that the district court abused its discretion by holding defendants in contempt. Accordingly, we vacate the order. Plaintiffs' cross-appeal for the appointment of a special master is dismissed.
 
 BACKGROUND
 
 2
 This appeal is the latest chapter in a decade-old dispute between the parties.
 
 I. Procedural History
 
 3
 Neonatology is the treatment of newborns. At Danbury Hospital, two neonatology practice groups — plaintiffs' CNC and the Hospital's subsidiary, DOPS — have coexisted since 1994 when plaintiffs ("CNC physicians") split off from DOPS to form their own practice group. The two groups compete for patients, and as such their relationship has been less than harmonious.
 
 
 4
 In 1994, in response to defendants' attempts to exclude CNC physicians from treating newborns at the Hospital, CNC physicians sued for violation of federal and state antitrust laws. After a jury found for plaintiffs, the parties settled and entered into the consent decree at issue in this action.
 
 
 5
 The Decree is designed to preclude defendants from engaging in further anti-competitive behavior. Paragraph 1 orders them to:
 
 
 6
 take no action, directly or indirectly, to limit, preclude or obstruct the plaintiffs, and each of them, from practicing neonatology at Danbury Hospital ... within the scope of their clinical privileges, in the same manner and to the same extent as any other neonatologist with medical staff privileges at the Hospital.
 
 
 7
 Paragraph 2 is more specific. It requires that the Hospital ensure that its neonatal nurse practitioners do not favor DOPS patients over those of CNC.
 
 
 8
 Paragraph 3 permits the Hospital to adopt neutral policies that "affect the manner in which the plaintiffs practice neonatology at the Hospital, so long as such ... policies ... (a) apply equally to all neonatologists with medical staff privileges at the Hospital, and (b) have been duly adopted and approved within the ordinary course of business."
 
 
 9
 Later in 1994, a hospital committee of neonatologists (including plaintiff, Dr. Joseph Tuggle), pediatricians, and obstetricians created guidelines for neonatologist referrals. The purpose was to identify exactly which neonatology group would be responsible for the care of a given newborn. This decision was to be made by the patient before the delivery of the baby, and the guidelines emphasized patient choice. To this end, a form was given to obstetricians to record parents' timely choice of neonatologist.
 
 
 10
 On March 1, 1996, the district court found DOPS and the Hospital in contempt of the Decree for the first time. Specifically, the court held that Dr. Lester Silberman, then Chairman of the Hospital's Department of Obstetrics and Gynecology (now retired), had encouraged obstetricians in two private practice groups — Physicians for Women ("PFW") and Candlewood OB/GYN Associates ("Candlewood") — to recommend that their patients select DOPS rather than CNC neonatologists. According to the court, this attempt to influence patients reduced referrals to CNC neonatologists and was directly attributable to the Hospital's misconduct.
 
 
 11
 As a result, the district court enjoined defendants from further violation of the Decree, ordering them no longer, "directly or indirectly, by word or conduct of their officers, employees, or agents, ... [to] affect or influence the designation of neonatologists at Danbury Hospital."
 
 
 12
 On March 19, 1996, DOPS and the Hospital moved to stay the injunction and to clarify its scope. In particular, defendants expressed concern that the Hospital's current neonatologist designation policy was inconsistent with the injunction. In denying the stay, the district court found the injunction to be "entirely consistent" with the Hospital's neonatology referral guidelines and to "simply reiterate[ ]" the Decree's mandate that defendants "not interfere with [CNC physicians'] practice of neonatology at Danbury Hospital."
 
 
 13
 In keeping with the district court's rulings, the Hospital took steps to implement its policy more effectively. Dr. Matthew Miller, the Hospital's Vice President of Medical Affairs, attempted to clarify the policy as well as the court's instructions in a memorandum stating that a "pregnant woman has complete authority to make these physician choices," and provided an updated designation form requiring the signature of the mother as well as of the obstetrician.
 
 II. The District Court's Findings
 
 14
 In 2002, CNC physicians moved to hold DOPS and Danbury Hospital in contempt for a second time. They alleged that: (1) the Hospital's designation system is designed to, and does in fact, favor DOPS neonatologists; (2) the Hospital's entering into a joint venture with Candlewood and PFW, the largest local obstetric groups, was a quid pro quo for the groups' favoring of DOPS neonatologists; and (3) the Hospital and DOPS encouraged the designation of DOPS neonatologists to the exclusion of CNC physicians.
 
 
 15
 The district court rejected the first two objections, finding that the referral system was not per se biased and that no quid pro quo existed. Regarding the third allegation, the court concluded that after 1996 certain obstetricians — namely, Drs. Richard Ruben and James Xenophon — continued to steer obstetricians toward DOPS to the exclusion of CNC neonatologists, but that defendants were "not directly responsible for the[ir] conduct." Nevertheless, according to the court, the Hospital could have avoided this improper influence "by providing for the designation to be obtained by other than [obstetricians]," and its failure to "cancel[ ] or neutralize[ ] the [pre-1996] enlistment" of obstetricians constituted contempt. Specifically, the court faulted the Hospital (but not DOPS) for putting obstetricians in charge of obtaining patients' neonatologist designation despite its knowledge that the obstetricians' recommendations continued to be tainted by the prior influence.
 
 
 16
 To cure the contempt, the court ordered the Hospital to assign the responsibility of recording patients' choice of neonatologist to non-obstetricians. The court suggested that these choices be obtained from patients "during pregnancy, by mail or direct communication by hospital personnel with the prospective parent(s)." The district court awarded CNC physicians $86,900 in damages (just 5% of their alleged losses) and cited other independent, non-contemptuous factors as possibly contributing to the decrease in CNC referrals. It declined to award costs or to appoint a special master.
 
 
 17
 This appeal followed.
 
 DISCUSSION
 I. The Contempt Citation
 A. Standard of Review
 
 18
 We review a district court's factual findings for clear error, but a finding of contempt under an abuse of discretion standard. See United States v. Local 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO, 44 F.3d 1091, 1095 (2d Cir.1995). However, our review of a contempt order is more exacting than under the ordinary abuse-of-discretion standard because a district court's contempt power is narrowly circumscribed. Equal Employment Opportunity Comm'n v. Local 638, 81 F.3d 1162, 1171 (2d Cir.1996). Moreover, we review a district court's interpretation of the terms of a consent decree de novo. See Local 1804-1, 44 F.3d at 1095.
 
 B. The Merits
 
 19
 To establish contempt, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir.1995). In holding the Hospital in contempt, the district court concluded that CNC physicians had satisfied all three elements.
 
 
 20
 First, the district court ruled that its 1996 contempt ruling "implicitly" demonstrated that the Decree was "clear and unambiguous, thus establishing the rule of the case." Second, the court regarded the Hospital's failure to "neutralize[ ] the [pre-1996] enlistment" of obstetricians as clear and convincing proof of noncompliance. Finally, the court held that this failure also demonstrated that the Hospital had not reasonably attempted to comply with the Decree.
 
 
 21
 The district court's analysis trenches upon the well-established principle that the language of a consent decree must dictate what a party is required to do and what it must refrain from doing. United States v. O'Rourke, 943 F.2d 180, 187 (2d Cir.1991). In United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the Supreme Court held that "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." Id. at 682, 91 S.Ct. 1752. Consistent with this narrow construction, we have recognized that courts must abide by the express terms of a consent decree and may not impose supplementary obligations on the parties even to fulfill the purposes of the decree more effectively. See King, 65 F.3d at 1058; United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 998 F.2d 1101, 1107 (2d Cir.1993) ("Teamsters I"). "A court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals." Teamsters I, 998 F.2d at 1107.
 
 
 22
 In its summary analysis of the first contempt element, the district court reasoned that the consent decree was "clear and unambiguous" because the court had so held in 1996. However, the court appeared to rule in a vacuum and failed to evaluate whether the order was "clear and unambiguous" with reference to the conduct in question. In conducting this analysis ourselves, we cannot agree that the Decree "clear[ly] and unambiguous[ly]" prohibited the Hospital from implementing its referral policy or from using obstetricians to record patients' choice of neonatologist. The Decree prohibits only "limit[ing], preclud[ing] or obstruct[ing] the plaintiffs ... from practicing neonatology," but says nothing of taking steps to prevent other doctors from interfering with CNC physicians' practice or of changing the designation policy.
 
 
 23
 Evidently, the district court at one point agreed with our reading of the Decree: in 1996, the court explicitly sanctioned the Hospital's policy in response to defendants' motion to clarify the scope of the injunction. The court ruled that "the injunction is perfectly harmonious with the [Hospital's] neonatology referral guidelines," and "simply reiterates relief obtained in the consent decree: defendants may not interfere with plaintiffs' practice of neonatology at Danbury Hospital." The obvious implication is that the district court, like defendants, understood the referral policy to be consistent with the Decree.
 
 
 24
 For these reasons, defendants cannot be said to have violated "[a] clear and unambiguous order ... that leaves `no uncertainty in the minds of those to whom [the order] is addressed.'" King, 65 F.3d at 1058 (quoting Hess v. N.J. Transit Rail Operations, Inc., 846 F.2d 114, 116 (2d Cir.1988)). We conclude that plaintiffs failed to establish the first element of contempt.
 
 
 25
 Because the Decree does not clearly and unambiguously require defendants to change the designation policy or to exclude obstetricians from the process of selecting neonatologists, we find that CNC physicians also failed to establish the second element of contempt. Specifically, there is no proof — certainly none that is "clear and convincing" — of noncompliance with the Decree. The district court failed to identify a specific command in the Decree that defendants violated, cf. United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO, 141 F.3d 405, 409 (2d Cir.1998) ("Teamsters II"), and we can perceive no such violation. The Decree prohibits defendants only from actively interfering with CNC physicians' practice, but is silent regarding remedial steps. We agree with defendants that to hold them in contempt for failing to change their designation policy would be to expand the meaning of the Decree beyond its four corners.
 
 
 26
 Finally, we conclude that CNC physicians also failed to establish the third element of contempt. There is no evidence, at least none credited by the district court, that defendants have not attempted to comply in a reasonable manner with the terms of the Decree. The district court found that defendants were not "directly responsible for the [improper] conduct" of Drs. Ruben and Xenophon, who are neither agents of the Hospital nor parties herein. See Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 833 (2d Cir.1930) (noting that "it is not the act described which the decree may forbid, but only that act when the defendant does it"). Nor did the court find that defendants had taken any direct steps to contravene the Decree.
 
 
 27
 A contempt order is a "`potent weapon,' to which courts should not resort `where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" King, 65 F.3d at 1058 (internal citations omitted). Although we do not find its factual findings to be clearly erroneous, the court's legal conclusion of contempt lacks factual support. We thus hold that the district court abused its discretion in issuing a contempt decree and awarding damages.
 
 II. The Injunction
 A. Standard of Review
 
 28
 We review a district court's enforcement of a consent decree for abuse of discretion. See Equal Employment Opportunity Comm'n v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, 925 F.2d 588, 595 (2d Cir.1991).
 
 B. The Merits
 
 29
 It is axiomatic that courts may craft equitable remedies to enforce a consent decree, but only in accordance with the terms of the decree without altering the agreement as written. See Equal Employment Opportunity Comm'n v. N.Y. Times Co., 196 F.3d 72, 78-79 (2d Cir.1999); Teamsters II, 141 F.3d at 408. The district court's 2002 injunction is not designed to ensure compliance with the Decree, but rather improperly expands its terms and imposes obligations on defendants that are beyond its scope. See N.Y. Times, 196 F.3d at 78-79; Teamsters I, 998 F.2d at 1107.
 
 
 30
 Although plaintiffs might have "a persuasive argument for modifying the original decree ... on a claim that unforeseen circumstances now made additional relief desirable to prevent the evils aimed at by the original complaint," that issue is not before us. Armour, 402 U.S. at 681, 91 S.Ct. 1752 (noting that "where we deal with the construction of an existing consent decree, such an argument is out of place").
 
 
 31
 Because requiring the Hospital to abandon its use of obstetricians in obtaining patients' choice of neonatologist is beyond the scope of the Decree, the district court abused its discretion in issuing the injunction.
 
 III. Special Master
 
 32
 Because defendants are not in contempt of the Decree and instead appear to have made reasonable efforts to comply, we see no need to direct the appointment of a special master, as CNC physicians urge.
 
 IV. Procedural Defenses
 
 33
 We have also reviewed defendants' procedural defenses of laches, res judicata, and collateral estoppel, and find them without merit.
 
 A. Laches
 
 34
 We review rulings regarding laches for abuse of discretion. See Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 193 (2d Cir.1996).
 
 
 35
 To prove laches, the defense must establish: (1) an unreasonable delay by the plaintiff in bringing suit; and (2) prejudice to the defendant. See Merrill Lynch Inv. Managers v. Optibase Ltd., 337 F.3d 125, 132 (2d Cir.2003).
 
 
 36
 Because the central issue of the contempt proceeding involved the continued improper motivation of obstetricians after 1996, we find no lack of diligence on the part of CNC physicians. Although we ultimately disagree with plaintiffs' substantive assertions, we affirm the holding of the district court that defendants' laches argument was meritless.
 
 B. Res Judicata
 
 37
 We review de novo a district court's decisions regarding res judicata. See Computer Assocs. Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 368-69 (2d Cir.1997).
 
 
 38
 Res judicata precludes parties from litigating issues "that were or could have been raised" in a prior proceeding. Monahan v. N.Y. City Dep't of Corr., 214 F.3d 275, 284-85 (2d Cir.2000) (quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)).
 
 
 39
 In its motion for contempt, plaintiffs alleged continuing misconduct by defendants, allegations which, if substantiated, could have given rise to a new claim for damages. See Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 327-28, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) (noting that the same "course of conduct ... may frequently give rise to more than a single cause of action"). Therefore, res judicata is inapplicable. Even though the district court rejected two of plaintiffs' contentions and we are reversing as to the third, we affirm the district court's dismissal of the res judicata defense.
 
 C. Collateral Estoppel
 
 40
 Collateral estoppel prevents the litigation of a legal or factual issue already decided in an earlier proceeding. See Boguslavsky v. Kaplan, 159 F.3d 715, 719-20 (2d Cir.1998).
 
 
 41
 Ordinarily, we review de novo a district court's decision regarding collateral estoppel. See Chartier v. Marlin Mgmt., LLC, 202 F.3d 89, 93 (2d Cir.2000). Although defendants raise collateral estoppel for the first time on appeal, they are correct that the claim arose only after the district court delivered its opinion. See Greene v. United States, 13 F.3d 577, 586 (2d Cir.1994) (stating that it is "well-established... that an appellate court will not consider an issue raised for the first time on appeal," but that exceptions are made, for instance, "to remedy an obvious injustice"). Defendants allege that the district court's 2002 contempt order recasts its 1996 findings. Specifically, defendants claim that the district court changed its view of Dr. Silberman's role in the events giving rise to the 1996 contempt ruling against the Hospital and DOPS. We review this claim, but find the court's 2002 statements regarding Dr. Silberman to be entirely consistent with its earlier holding. For this reason, we conclude that the collateral estoppel defense is likewise without merit.
 
 CONCLUSION
 
 42
 The district court's October 30, 2002 order holding Danbury Hospital in contempt of the 1994 consent decree and awarding damages to CNC physicians is hereby VACATED. The injunction requiring the Hospital's neonatologist designation policy to be changed is likewise VACATED.