**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO et al., Defendants,**

**Ron Carey, Defendant–Appellant.**

**Docket No. 98–6014.**

United States Court of Appeals, Second Circuit.

Argued July 13, 1998.

Decided Sept. 18, 1998.

Reid H. Weingarten, Steptoe & Johnson, Washington, D.C. (Mark J. Hulkower, Jeffrey R. Gans, Bruce C. Bishop, Steptoe & Johnson, on the brief), for Appellant.

Karen B. Konigsberg, Assistant United States Attorney, Southern District of New York, New York, N.Y. (Mary Jo White, United States Attorney for Southern District of New York, Andrew W. Schilling, Steven M. Haber, Assistant United States Attorneys, on the brief), for Appellee.

Before: MINER and CABRANES, Circuit Judges, and CHATIGNY,* District Judge:

JOSÉ A. CABRANES, Circuit Judge:

Ron Carey appeals from an order of the United States District Court for the Southern District of New York (David N. Edelstein, *Judge*), *United States v. Int'l Bhd. of Teamsters* ("*Carey*"), 988 F.Supp. 759 (S.D.N.Y.1997). That order affirmed a decision of the Election Officer ("EO"), an official appointed under the consent decree that had been entered in *United States v. Int'l Bhd. of Teamsters*, No. 88 Civ. 4486 (S.D.N.Y. Mar. 14, 1989) ("Consent Decree").[1]

---

* The Honorable Robert N. Chatigny, of the United States District Court for the District of Connecticut, sitting by designation.

1. In several prior opinions of this Court, we have summarized the history of this consent decree, which was entered in a civil action filed by the United States under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, against the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, the Commission of La Cosa Nostra, and individuals in both organizations. *See, e.g., United States v. International Bhd. of Teamsters* ("*1991 Election Rules*"), 931 F.2d 177, 180–81 (2d Cir.1991). We assume familiarity with this history.

The district court entered the order in this case as part of its continuing oversight of the implementation of the Consent Decree between the United States and the IBT that resolved the RICO action. The Consent Decree instituted sweeping structural reforms of the IBT's electoral and disciplinary processes, including the creation of the position of an Election Officer to supervise the restructuring of the union's electoral system, *see 1991 Election Rules*, 931 F.2d at 180–81, and the creation of an Independent Review Board ("IRB") to investigate and discipline violations of IBT rules, *see, e.g., United States v. Int'l Bhd. of Teamsters* ("*Friedman & Hughes*"), 905 F.2d 610, 613 (2d Cir.1990); *United States v. Int'l Bhd. of Teamsters* ("*IRB Rules*"), 998 F.2d 1101, 1105–06 (2d Cir.1993).

Following an investigation into campaign financing violations by Ron Carey's campaign for re-election as general president of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT" or the "Teamsters") during the 1996 IBT general election, the Election Officer determined that Carey knew of and participated in his campaign's misconduct. The Election Officer's selected remedy was to disqualify Carey from standing as a candidate in the 1998 rerun of the 1996 general election. The district court affirmed the EO's decision, and Carey now appeals. He argues that (i) the Election Officer's investigation and decision did not comport with constitutional or statutory due process guarantees; (ii) the district court erred in affirming the Election Officer's decision without a full evidentiary record before it; and (iii) the Election Officer's decision, on its face, was arbitrary, capricious, and an abuse of discretion. We disagree, and affirm the district court's order upholding the Election Officer's decision.

## I.

Following balloting in the 1996 IBT general election, in which incumbent IBT General President Ron Carey prevailed by a narrow margin, then-Election Officer Barbara Zack Quindel initiated an investigation into alleged violations of the 1996 Election Rules by the Carey campaign. EO Quindel's investigation resulted in a report dated August 21, 1997 that detailed significant campaign financing abuses. In particular, the report identified a "swap scheme" by which IBT general treasury funds were contributed to various political causes in exchange for contributions to Carey's campaign from individual supporters of those causes. EO Quindel determined that within an eight-day period in October 1996, the IBT made some $735,000 in contributions, as a result of which the Carey campaign received at least $100,000—money that was used principally to finance a last-minute

The Consent Decree is reproduced at pages 31–58 of the parties' Joint Appendix on appeal.

**2.** The 1996 Election Rules are reproduced in pertinent part at pages 69–107 of the parties' Joint Appendix on appeal.

direct mail campaign in support of the Carey slate in November 1996.

The 1996 Election Rules promulgated under the Consent Decree prohibit, *inter alia,* the direct or indirect use of union funds to promote the candidacy of any individual. *See* 1996 Election Rules art. XII § 1(b)(3); *see also* 1996 Election Rules art. XII § 1(b)(1) (prohibiting employers and labor unions, including the IBT, from contributing "directly or indirectly, anything of value, where the purpose, object or foreseeable effect of the contribution is to influence" the election of a candidate, and prohibiting candidates from accepting or using such contributions).[2] Because the Carey campaign's swap scheme violated the 1996 Election Rules, and because she found that the direct mailing made possible by those violations may have affected the outcome of the 1996 balloting, EO Quindel refused to certify the 1996 results and ordered a rerun of the IBT election. Neither Carey nor his campaign challenged EO Quindel's factual findings.

EO Quindel declined to impose the additional remedy of disqualifying Carey or members of his slate of candidates because her investigation had not disclosed evidence that they knew of or participated in the improper fundraising. Noting, however, that "important questions remain[ed] unanswered" regarding Carey's knowledge and conduct, EO Quindel warned that "[i]f, subsequent to the issuance of this decision, evidence is brought to the Election Officer's attention that could warrant disqualification of Mr. Carey or other members of his slate, the Election Officer will consider it."

On September 18, 1997 three individuals affiliated with the Carey campaign—including Jere Nash, Carey's campaign manager—pled guilty to felonies arising out of their conduct in the 1996 campaign. Shortly thereafter, EO Quindel reopened her investigation into whether Carey had knowledge of or participated in the improper campaign fundraising activities. On September 29, 1997, Kenneth Conboy[3] was designated by

**3.** Prior to that date, Conboy served as the Election Appeals Master, an official appointed under the Consent Decree to hear appeals from the Election Officer's decisions on 1996 election pro-

the district court as the Election Officer "for the sole purpose of investigating and deciding the issue of the disqualification of Ronald Carey from the rerun election."

In addition to reviewing documentary evidence of the IBT's and the Carey campaign's finances, EO Conboy questioned Carey under oath, and interviewed witnesses such as Nash and Monian Simpkins, Carey's secretary, both of whom later provided sworn affidavits. On November 17, 1997, EO Conboy issued a 74–page decision detailing not only the swap scheme identified in EO Quindel's August 1997 report (as to which he revised the estimate of funds improperly obtained by the Carey campaign to $227,500), but also additional improper fundraising activities conducted by the Carey campaign, including raising campaign funds from individuals—specifically, several non-IBT union officials and an employer—whose contributions were impermissible under the 1996 Election Rules, *see* 1996 Election Rules art. XII § 1(b)(1), (3). More importantly, however, EO Conboy concluded, based on his investigation, that Carey knew of and participated in his campaign's violations of the 1996 Election Rules.

Central evidence of Carey's knowledge and involvement was provided by Nash and Simpkins, whose testimony EO Conboy credited over Carey's denials. With respect to the swap scheme, Nash stated under oath that, after Carey (in his capacity as IBT General President) had initially refused to approve one of the "swap" contributions, Nash had advised Carey that "the proposed IBT contribution would help [Martin] Davis [a Carey campaign consultant] with fundraising for the Carey campaign," and that Carey

"indicated that he would approve the contribution." Simpkins stated under oath that Nash had explained to her the contribution swap scheme and requested her assistance in expeditiously processing the requests for disbursements of IBT funds; she attested that she subsequently had a conversation with Carey in which she told him "that Nash had talked to [her] about the IBT making contributions." Simpkins also stated in her sworn testimony that she obtained Carey's approval for each of the swap contributions and that, each time, she indicated to Carey that the contribution request "was one that Jere Nash had called about." Carey claimed under oath to have no specific recollection of authorizing the IBT contributions (though he did not deny that he did so) [4] or of discussing them with Nash, Simpkins or others in the union.

With respect to raising campaign funds from individuals who were ineligible contributors under the 1996 Election Rules, Nash stated under oath that he had specifically discussed the contributions of one ineligible individual with Carey on several occasions. Nash also stated that he had supplied Carey with documentary updates on the campaign's finances that included information about the improper contributions. Carey generally denied knowledge of these fundraising efforts.

Having concluded that Carey knew of and participated in the swap scheme "based on his understanding that those contributions would assist his campaign's fundraising efforts," and that Carey knew of and failed to put a halt to fundraising from ineligible contributors, EO Conboy disqualified Carey from standing for office in the 1998 rerun of the 1996 election. Such action was neces-

---

tests, and whose own decisions were appealable to the district court. When EO Quindel recused herself from the Carey investigation on September 23, 1997, the government and the IBT agreed to Conboy's designation as an Election Officer for the limited purpose of stepping into and completing EO Quindel's investigation. They also agreed that any decision by Conboy as Election Officer would be appealable directly to the district court, without the need to first proceed before an Election Appeals Master.

4. Memoranda from the IBT's then-Director of Government Affairs to Carey (in his capacity as

IBT president) requesting authorization to use union funds to make each of the contributions bore notations such as "okay RC MS 10/24/96," which Carey acknowledged indicated that Simpkins ("MS") discussed the request with him ("RC") on that date, and that he approved it. Although he claimed not to specifically recall authorizing the requests, Carey agreed, based on Simpkins' notations on the memoranda, that he believed he had personally authorized the contributions. At no point did he suggest that his authorizations had been fabricated.

sary, EO Conboy concluded, "to ensure a fair rerun election and to protect the integrity of the [IBT] electoral process." The district court affirmed the Election Officer's decision over Carey's objections, concluding that Carey had received all the procedural protections to which he was entitled, and that neither the EO's factual determinations nor his selection of disqualification as a remedy was arbitrary or capricious. *See Carey,* 988 F.Supp. at 766–68. This appeal followed.

## II.

Carey first challenges the Election Officer's decision on due process grounds. He contends that EO Conboy's investigation and decisionmaking did not afford him procedural protections to which he was entitled under (i) the Due Process Clause of the Constitution and (ii) the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 401 *et seq.* In particular, Carey objects to the fact that he was not afforded an evidentiary hearing at which to cross-examine witnesses and confront the evidence relied upon by EO Conboy in his November 17, 1997 disqualification decision. The government responds that neither the Due Process Clause nor the LMRDA was implicated by the Election Officer's investigation and decision. We review these questions of law *de novo. See United States v. Cruz–Flores,* 56 F.3d 461, 463 (2d Cir.1995) (due process); *Doyle v. Kamenkowitz,* 114 F.3d 371, 374 (2d Cir.1997) (LMRDA).

### A. Due Process and State Action

█ It is axiomatic that before a litigant may pursue a claim that he has been deprived of a constitutional right—including the right to due process of law—he must first establish that the challenged conduct constituted "state action." That is, the conduct of which he complains "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and the party charged with the conduct must be a person who may fairly be said to be a state actor." *United States v. Int'l Bhd. of Teamsters ("Senese"),* 941 F.2d 1292, 1296 (2d Cir.1991) (quoting *Lugar v.*

*Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)) (internal punctuation omitted), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).

As Carey acknowledges, this Court has previously held that officials appointed pursuant to the IBT Consent Decree are *not* state actors. *See United States v. Int'l Bhd. of Teamsters ("Sansone"),* 981 F.2d 1362, 1371 (2d Cir.1992); *United States v. Int'l Bhd. of Teamsters ("Star Market"),* 954 F.2d 801, 806 (2d Cir.1992), *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992); *Senese,* 941 F.2d at 1296. These officials derive their powers from and act pursuant to a *private* agreement—namely, the IBT Constitution, which has been amended to incorporate and conform to all the terms of the Consent Decree. *See Senese,* 941 F.2d at 1296; *United States v. Int'l Bhd. of Teamsters ("1996 Election Rules"),* 896 F.Supp. 1349, 1363 (S.D.N.Y.1995), *aff'd as modified,* 86 F.3d 271 (2d Cir.1996). By those terms, the IBT and its General Executive Board have delegated to the Consent Decree officials certain aspects of their authority over internal union operations—such as, here, the authority to supervise and investigate protests arising out of the 1996 IBT election. *See Star Market,* 954 F.2d at 806 (EO actions taken pursuant to IBT Constitution); *United States v. Int'l Bhd. of Teamsters ("1991 Election Rules"),* 742 F.Supp. 94, 105–06 (S.D.N.Y.1990) (EO's authority and election rules "arise under power reserved for the IBT under its Constitution"), *aff'd as modified,* 931 F.2d 177 (2d Cir.1991).

█ Notwithstanding these precedents, Carey contends that in the particular circumstances of this investigation and decision, EO Conboy's decision is properly characterized as state action. He cites as distinguishing factors (i) the government funding of 1996 IBT election expenses, including the EO's salary; (ii) the United States Attorney's office's role in making information available to the investigation, as by providing access to Nash, who is now cooperating with the government; (iii) the district court's role in "lending its coercive power to the EO's investigation"; and (iv) the Consent Decree's origins in litigation brought by the government.

We are not persuaded that these factors sufficiently distinguish the instant investigation to compel a different result from *Sansone, Star Market,* and *Senese.*

 As to the first factor cited by Carey, it is well-established that the mere receipt of public funds will not transform a private actor into a state actor. *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 544, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) ("The Government may subsidize private entities without assuming constitutional responsibility for their actions."); *Leeds v. Meltz,* 85 F.3d 51, 54 (2d Cir.1996). Second, the receipt of information and assistance from federal authorities does not render the recipient's subsequent, independently rendered *decision* using such information "fairly attributable" to the government, *Lugar,* 457 U.S. at 937, 102 S.Ct. 2744.[5] *See San Francisco Arts & Athletics,* 483 U.S. at 546, 107 S.Ct. 2971 (government involvement in entity's creation, regulation, and funding did not render entity's decisions state action absent government coercion or encouragement); *Albert v. Carovano,* 851 F.2d 561, 570–71 (2d Cir.1988) (in banc) (private university's individual disciplinary decisions under a state-mandated disciplinary policy not attributable to state). Finally, the last two factors cited by Carey are not new to this Election Officer's investigation, and we have previously rejected them as grounds for finding state action by a Consent Decree official. *See Star Market,* 954 F.2d at 806–07 (rejecting argument that district court enforcement of Consent Decree official's decision rendered decision state action); *Senese,* 941 F.2d at 1296 (rejecting argument that Consent Decree official was state actor because his position was established "to settle a lawsuit brought by the Government"). Accordingly, we conclude that the Election Officer's activities did not constitute state action and hence did not implicate constitutional due process requirements.

## B. The LMRDA

The 1996 Election Rules specify certain procedural safeguards for those who are the subject of an Election Officer's investigation and decision. *See* 1996 Election Rules art. XIV § 3(d) (requiring EO to provide a copy of the protest on which the investigation is based to each potential subject, and specifying that each such person or entity "shall have the opportunity to present evidence and/or legal argument" to the EO). Carey's principal claim, however, is not that EO Conboy failed to comply with the 1996 Election Rules,[6] but that he failed to comply with the more extensive procedural requirements mandated by the LMRDA in connection with "disciplinary" actions.

Title I of the LMRDA, 29 U.S.C. § 411 *et seq.*, is entitled "Bill of Rights of Members of Labor Organizations." It protects and guarantees the rights of union members by, among other things, imposing restrictions and procedural safeguards on union disciplinary actions (which previously had been used improperly as devices to enforce incumbents' control over the unions). *See Finnegan v. Leu,* 456 U.S. 431, 435–36, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982); *Franza v. Int'l Bhd. of Teamsters Local 671,* 869 F.2d 41, 44 (2d Cir.1989). Specifically, § 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), provides that

> [n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined ... by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to

---

5. Carey does not suggest that the U.S. Attorney's office participated in EO's decisionmaking itself.

6. Carey acknowledges having received a copy of the protest. He testified in a sworn deposition before EO Conboy, during which he was questioned about, among other things, conversations with Nash and Simpkins regarding the swap contributions, and fundraising from an ineligible source; following that deposition, Carey also submitted to EO Conboy a 20–page document addressing evidentiary and legal issues. Although Carey maintains that these measures were inadequate to ensure procedural fairness, it is clear enough that they did comply with the requirements of the 1996 Election Rules. *Cf. Star Market,* 954 F.2d at 807 (finding due process had been afforded where EO provided copy of protest and solicited information from the subject of the protest, and review was had on the basis of written submissions and a telephone hearing).

prepare his defense; (C) afforded a full and fair hearing.

Carey contends that he was "otherwise disciplined" by EO Conboy, such that he should have been afforded the full panoply of procedural protections under § 101(a)(5)—including, in particular, a full, adversarial evidentiary hearing of the allegations against him. We disagree.

Section 101(a)(5)'s procedural protections apply only to disciplinary actions that affect "membership rights," see *Finnegan*, 456 U.S. at 438, 102 S.Ct. 1867[7]—such as the right to nominate candidates for office, to vote in union elections, to attend membership meetings, and to express views and opinions on union business, see LMRDA § 101(a)(1), (2), 29 U.S.C. § 411(a)(1), (2). Although the government contends that Carey's § 101(a)(5) claim must fail because he claims abrogation of a right—the right to run for election to union office—not itemized in Title I,[8] we have stated that "rendering a man ineligible from seeking union office ... affects him as a member and permits him under the Act to challenge the fairness of the procedures resulting in such political exile." *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir.1973) (emphasis omitted); *cf. Newman v. Local 1101, Communications Workers*, 570 F.2d 439, 448 (2d Cir.1978) (plaintiff retained "all of the rights of union membership, including ... candidacy for union office").

Nevertheless, Carey's reliance on § 101(a)(5) is misplaced. Although candidacy for union office is a "membership right" protectable under Title I of the LMRDA, EO Conboy's decision did not constitute "discipline" in the first instance. Union action affecting a membership right constitutes "discipline" for purposes of triggering § 101(a)(5) where that action is "imposed as a sentence on an individual by a union in order to punish a violation of union rules." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 92 n. 15, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989). Such discipline is retaliatory in nature, see *Finnegan*, 456 U.S. at 436, 102 S.Ct. 1867; *Galke v. Duffy*, 645 F.2d 118, 120 (2d Cir. 1981) ("discipline" defined as "official union conduct that has the purpose and effect of punishing a member"); it is also retrospective in focus, administering penalties in relation to the gravity of the past wrong, see *United States v. Int'l Bhd. of Teamsters ("Simpson")*, 120 F.3d 341, 348–49 (2d Cir. 1997). This punitive dimension was absent from the Election Officer's mandate and his decision.

The Election Officer is not assigned disciplinary responsibilities. His mandate is to supervise the reformation of the IBT's electoral processes, and, where necessary, expeditiously to investigate and rule upon protests[9] arising out of those processes—all

---

**7.** *Finnegan* contrasted the rights of union members *as members* with the rights of union members as officers or employees of the union, holding that only the former are protected by Title I of the LMRDA. *See* 456 U.S. at 436–37, 102 S.Ct. 1867 (stating that "it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect"; discharge of union's appointed business agents held not to be "discipline" under Title I). Accordingly, Carey cites a privilege common to all members in good standing—the privilege of standing for election to union office—as the membership right on which his § 101(a)(5) claim is based.

**8.** The government cites as support *United States v. Mason Tenders District Council*, No. 94 Civ. 6487, 1997 WL 340993, at *7 (S.D.N.Y. June 20, 1997); *Lockett v. Int'l Longshoremen's Ass'n, Local 19*, 609 F.Supp. 676, 677 (N.D.Ill.1985); and *Gammon v. Int'l Ass'n of Machinists*, 199 F.Supp. 433, 436 (N.D.Ga.1961), which treated

the list of membership rights in § 101(a)(1), (2) as exclusive. These cases do not, however, supply a basis for departure from our precedent in *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973).

**9.** The Election Officer under the Consent Decree has presided over some 3,000 such protests—including the one giving rise to the instant appeal—in the 1991 and 1996 election cycles. Under the 1996 Election Rules, the EO must reach a determination on the merits of the protest within seven to twenty-one days, depending on the time of filing and the type of misconduct alleged. *See* 1996 Election Rules art. XIV §§ 2(f), 3(e). EO Conboy's disposition of the instant protest proceeded under a modified timetable that ultimately afforded him slightly less than two months in which to investigate and render a decision regarding Carey's disqualification. *See United States v. Int'l Bhd. of Teamsters ("Applications X & XI")*, 981 F.Supp. 222, 232–33 (S.D.N.Y.1997).

with a view to ensuring "fair, honest, open and informed elections." 1996 Election Rules art. I (implementing Consent Decree § F at ¶ 12(D)(ix)). Where the EO uncovers electoral abuses, he is empowered to "take whatever *remedial* action is appropriate," *id.* art. XIV § 4 (emphasis supplied), in order to preserve and promote the integrity of the IBT's democratic processes.

The EO's mandate stands in contrast to that of the Independent Review Board ("IRB"), which is explicitly cloaked with the union's "disciplinary authority." Consent Decree § F at ¶ 12(A); *see also id.* § G at ¶ (m); *United States v. Int'l Bhd. of Teamsters ("IRB Rules"),* 998 F.2d 1101, 1105–06 (2d Cir.1993) (describing evolution and functions of IRB).[10] In this capacity, the IRB is involved in meting out punishment in relation to the culpability of the offender for past infractions of union rules, including acts of corruption and criminal activity that bring "reproach" on the IBT. *See, e.g., Simpson,* 120 F.3d at 343, 348–49. Disciplinary proceedings before the IRB follow procedures that fully comply with, and even surpass, the procedural protections of § 101(a)(5). *See* Consent Decree § F at ¶ 12(A).

EO Conboy explicitly acknowledged this functional distinction between his own remedial responsibilities with respect to the IBT election and the IRB's disciplinary responsibilities with respect to the union's rules and reputation. He noted that the IRB was the appropriate entity to mete out punishment, whereas his own role was to take the steps necessary to ensure that the rerun election was free, fair, open, and informed. Moreover, in determining that Carey should be disqualified from standing for office in the rerun election—a measure expressly identified in the 1996 Election Rules as a permissible remedy for electoral abuses, *see* 1996 Election Rules art. XIV § 4(c)—EO Conboy stated that "[t]his is a strictly remedial measure which is necessary to ensure a fair rerun election and to protect the integrity of the electoral process.... Indeed, failure to disqualify in this case ... would undermine the deterrent effect of the Election Rules going forward." In selecting a remedy first and foremost in relation to the prospective needs of the electoral process, EO Conboy properly left to the IRB the retrospective task of meting out discipline and punishment.[11]

In other contexts the disqualification of a candidate for union office may indeed involve disciplinary action. *See Schonfeld,* 477 F.2d at 903 (sanction imposed by union disciplinary tribunal); *see also Gesink v. Grand Lodge, Int'l Ass'n of Machinists and Aerospace Workers,* 831 F.2d 214, 215 (10th Cir. 1987) (per curiam) (same); *Goodman v. Laborers' Int'l Union,* 742 F.2d 780, 782 (3d Cir.1984) (same); *but see Department of Labor v. Aluminum, Brick & Glass Workers Int'l Union, Local 200,* 941 F.2d 1172, 1180–81 (11th Cir.1991) (disqualification for failure to comply with filing rules not subject to § 101(a)(5)). We hold, however, that the Election Officer's selection of disqualification as a remedy, for expressly forward-looking and corrective purposes in connection with an IBT election under the Consent Decree, was not "discipline" and hence did not implicate § 101(a)(5) of the LMRDA.

### III.

Carey also advances a claim of procedural error on the part of the district court. Specifically, he contends that the district court did not have before it a proper evidentiary

---

**10.** Investigatory and disciplinary responsibilities under the Consent Decree were originally vested, respectively, in the Investigations Officer and the Independent Administrator. Following certification of the 1991 IBT election results, these Consent Decree officials were replaced by, and their responsibilities assumed by, the three-member IRB. *See* Consent Decree § G.

**11.** At the time of the Election Officer's decision, parallel IRB disciplinary proceedings against Carey were in progress. As of the time of this writing, the IRB has handed down a decision which is under review by the district court, and which can be expected to be the subject of a separate appeal to this Court. *See, e.g.,* Steven Greenhouse, *Board Expels Ron Carey from Teamsters for Life,* N.Y. Times, July 28, 1998 at A5. The IRB's findings, conclusions, and recommendations—which followed the Election Officer's decision and the district court's order in the instant action by some seven months—are outside the record of this appeal.

record on which it could meaningfully assess the Election Officer's factual determinations. In the circumstances presented, we see no grounds for reversal.

In reviewing EO Conboy's decision under the "same standard of review applicable to review of final federal agency action under the Administrative Procedure Act ['APA'],"[12] Consent Decree § K, and "based on all the evidence," the district court concluded that there was "ample support" for the determination that Carey violated the 1996 Election Rules. *Carey*, 988 F.Supp. at 767. Carey's contention is that the district court did not have all the evidence—or indeed, Carey claims, any of the evidence—before it.

EO Conboy's 74–page decision described at length the scope of his investigation and the factual support for his findings. Upon Carey's appeal to the district court, the government rested principally on EO Conboy's decision itself, accompanied by a December 18, 1997 letter brief describing, *inter alia*, the material reviewed by the EO in the course of his investigation. The following day the government furnished, "for the [district] [c]ourt's information," three volumes of exhibits that were part of the separate *IRB* proceedings against Carey. Included in those volumes were transcripts of Carey's three sworn depositions, copies of IBT records and memoranda regarding the "swap" contributions, and copies of Nash's and Simpkins's sworn affidavits.

Carey argues, however, that the *IRB* exhibits do not constitute the evidentiary record of the *Election Officer's* investigation. In the alternative, he argues that, even if the copies of the IRB exhibits were properly part of the record before the district court on appeal from EO Conboy's decision, they do not constitute a *full* record on which the district court could properly base its review.

Carey grounds his objections in the text and jurisprudence of the APA, whose standard of review is applied by the district court in reviewing the actions of Consent Decree officials. *See* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party. . . ."); *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citing APA "whole record" standard), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 864 F.2d 1225, 1230 (5th Cir.1989) ("In considering the record, we examine all of the evidence, not just that supporting the Board's conclusion.").

Although the Consent Decree provides that the district court will employ the APA standard of review, it does not explicitly work a wholesale incorporation of the breadth of APA jurisprudence. In the unusual and highly particular context of the Consent Decree, the scope of the evidentiary record on which the district court may properly base its review will vary from case to case. On review of IRB proceedings, for example, the district court will have access to the transcript and exhibits produced at an adversarial hearing—an adequate record on which to review virtually any factual or legal objection. Reviews of election protests, where no such evidentiary hearing occurs, will appear in a different posture. On some occasions, an Election Officer's decision (and, where applicable, the Election Appeals Master's decision) will rest on a set of uncontested facts, where the dispute on appeal arises out of the factual inferences and legal conclusions that may be drawn from them. *See, e.g., United States v. Int'l Bhd. of Teamsters ("Morris")*, 983 F.Supp. 488, 492–93 (S.D.N.Y.1997). In such circumstances, the

---

**12.** Under the APA, in order for a reviewing court to "set aside agency action, findings, and conclusions," it must find that the agency's findings and conclusions are

 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

 (B) contrary to constitutional right, power, privilege, or immunity;

 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

 (D) without observance of procedure required by law;

 (E) unsupported by substantial evidence . . .; or

 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

district court's review could properly proceed without resort to an evidentiary record beyond the official's decision. On the other hand, where the Election Officer's decision rests, as here, on contested facts (such as Carey's actual knowledge of his campaign's misconduct), it may be appropriate, or even necessary, for the government to supply the district court with record evidence on which the EO's factual determinations were based—so that, for example, the district court will be in a position to evaluate a challenge that the EO's decision was "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).

Here, the district court had before it on review key record evidence on which EO Conboy based his decision.[13] Accordingly, in the circumstances presented, we find Carey's procedural objection to the district court's order to be unavailing.

## IV.

Carey's final set of arguments on appeal is directed to the Election Officer's decision itself. Carey contends that even on its face (that is, notwithstanding his objections regarding the record on which the district court based its review), EO Conboy's decision—with respect to both factual findings and the selection of disqualification as a remedy—was arbitrary, capricious, and an abuse of discretion, and that the district court therefore erred in affirming it.

### A. Standard of review.

Although we have not previously stated the precise standard of review applicable to a district court order, such as the one before us, that itself reviews an Election Officer's decision under the Consent Decree, see, e.g., United States v. Int'l Bhd. of Teamsters ("DiGirlamo"), 19 F.3d 816, 819–20 (2d Cir.), cert. denied, 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); United States v. Int'l Bhd. of Teamsters ("Cimino"), 964 F.2d 1308, 1311 (2d Cir.1992), the Consent Decree specifies "an extremely deferential standard of review" by the district court—namely, the APA final agency action standard of review

outlined above—of decisions of the Consent Decree officials. DiGirlamo, 19 F.3d at 819–20. Accordingly, we have held that the district court is required to treat decisions such as those of the IRB with "great deference." Id. at 820. In any event, we need not determine a precise standard of review by the Court of Appeals of district court Consent Decree decisions at this time because we conclude, as we have on several occasions in the past, that the district court's order may be affirmed under any arguably applicable standard of review. See id.; Cimino, 964 F.2d at 1311.

### B. Factfinding

Carey's objections to the Election Officer's factual determinations are twofold. First, he contends that EO Conboy's decision must be overturned because it was based on "inadequate factfinding procedures." Second, he contends that the decision was based on "credibility determinations that were contrary to logic and established law." We find both objections unpersuasive.

■ By his allegation of "inadequate" factfinding procedures, Carey principally means that he did not have the opportunity to be present and to confront and cross-examine witnesses during their interviews with EO Conboy. Thus, he contends that the Election Officer's decision was arbitrary and capricious because it was, in Carey's words, "based on evidence taken in secret." While Carey is correct that our legal system generally favors the adversarial testing of evidence, see Crane v. Kentucky, 476 U.S. 683, 690–91, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); Gardner v. Florida, 430 U.S. 349, 360, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), it is not the case that any investigation and factfinding that is not conducted adversarially is per se inadequate or capricious. Although Carey no doubt would have preferred to have a front-row seat at every step of the Election Officer's investigation, his absence need not invalidate the results of that investi-

---

13. Although the exhibit volumes were compiled for the IRB proceeding, it is clear that the same documents were among the evidence before EO Conboy when rendering his decision.

gation.[14] *See United States v. Int'l Bhd. of Teamsters ("Wilson")*, 978 F.2d 68, 72 (2d Cir.1992) (lack of cross-examination did not render evidence in disciplinary action unreliable). Moreover, focused as they are on the lack of an opportunity to confront and cross-examine all the evidence against him (or, in other words, on the lack of an evidentiary hearing), Carey's objections to EO Conboy's factfinding procedures are more properly characterized as part and parcel of his due process arguments—and are more properly disposed of on those grounds (*see* Part II above).

 Because EO Conboy's conclusion that Carey knew of and participated in his campaign's violation of the 1996 Election Rules rests heavily on conversations Carey is alleged to have had with Nash and Simpkins, Carey challenges EO Conboy's decisions to credit their testimony. In particular, he contends that it was arbitrary and capricious for EO Conboy to credit Nash's account of his conversations with Carey inasmuch as Nash was testifying pursuant to a plea agreement with the government, and to credit Simpkins's statements inasmuch as she has offered other, inconsistent accounts of Carey's involvement.

We, however, agree with the district court that the Consent Decree officers closest to an investigation are "best equipped to evaluate the demeanor, credibility, and ultimately the culpability of those who appear before them," *Carey*, 988 F.Supp. at 767 (quoting *DiGirlamo*, 824 F.Supp. at 418) (internal punctuation omitted); *see also Cimino*, 964 F.2d at 1313 (refusing to reweigh evidence or question credibility determination of Consent Decree officer), and we see no cause here to overturn the credibility determinations reached by the Election Officer.

EO Conboy was fully aware of Nash's cooperation with the government and of the fact that Nash had pled guilty to a charge of perjuring himself during EO Quindel's original investigation of the Carey campaign. Although, as Carey contends, Nash's cooperation agreement might supply him with a motive to lie and implicate others in order to curry favor with the government, it is also the case that the agreement, which is expressly voided if Nash lies, simultaneously supplies an incentive to tell the truth. The critical point here, however, is that we are given no cause to believe that the Election Officer arbitrarily and capriciously disregarded this "double-edged" incentive when deciding to credit Nash's testimony.

Similarly, Carey contends that EO Conboy erred in crediting Simpkins's statements notwithstanding her prior conflicting accounts of Carey's involvement in the swap contributions. Again, EO Conboy was fully aware of Simpkins's changing accounts, which he noted were consistent with loyal attempts to protect her employer. Although Carey contends that it was "naïve[ ]" to credit Simpkins's statements, he has not persuaded us that it was reversible error to do so.

It is of course the case that a different factfinder might not credit Nash's and Simpkins's accounts over Carey's denials and, as a result, might not conclude that Carey knew of the improper conduct. But we are not persuaded that EO Conboy's decisions to credit those witnesses' accounts, and to disbelieve Carey's denials, were arbitrary, capricious, or an abuse of his discretion. In turn, then, we are presented with no basis on which to disturb the factual conclusion that rests on those credibility determinations—namely, that Carey was aware of his campaign's misconduct.

---

**14.** Under the guise of illustrating the pitfalls of EO Conboy's investigative process, Carey dedicates a portion of his appellate brief to outlining alleged "demonstrably clear errors of fact" in the disqualification decision that, he contends, could have been avoided if only he had been given access to EO Conboy's evidence-collecting process. It would be inappropriate, however, for this Court to review the district court's review of the Election Officer's findings on the basis of alleged facts that Carey contends he "could" prove if given the chance. Moreover, we may take notice that Carey made a "proffer" of this and other evidence to the district court in a Fed.R.Civ.P. 60(b) motion in this action while this appeal was pending; the district court denied the motion, on the ground, *inter alia*, that the alleged "new" evidence would not change the result. *See United States v. Int'l Bhd. of Teamsters ("Carey II")*, 179 F.R.D. 444 (S.D.N.Y. 1998).

**366**

## C. Choice of Remedy

 Carey's final argument is that the Election Officer's resort to disqualification—rather than some less severe measure—as a remedy was arbitrary, capricious, and an abuse of his discretion. We have noted, however, that "[t]he reviewing court should not overturn the [Consent Decree official]'s choice of sanctions unless it finds the penalty unwarranted in law or without justification in fact," and that such review is limited to determining only whether the official "made an allowable judgment in his or her choice of the remedy." *Wilson*, 978 F.2d at 73 (internal punctuation and citations omitted).

Under this deferential standard of review of sanctions imposed by a Consent Decree official, we see no grounds on which to conclude that EO Conboy's selection of disqualification—a remedy expressly contemplated by the terms of the 1996 Election Rules—was in any way arbitrary or capricious. EO Conboy was explicit that his "foremost concern in fashioning an appropriate remedy" was to "ensure that the rerun election is fair, credible and conducive to the strengthening of IBT electoral institutions." Upon careful and extended consideration, he concluded that that objective could only be fully served by removing Carey's name from the rerun ballot. Even if we were to accept *arguendo* Carey's premise that the Election Officer's only legitimate consideration in selecting the remedy of disqualification was "[w]hether disqualification of a properly nominated candidate would protect the fairness of the rerun election," it was an entirely allowable judgment for the Election Officer to determine that a rerun alone would be inadequate and to conclude that disqualification would indeed "protect the fairness of the rerun election." Accordingly, we will not disturb EO Conboy's choice of disqualification as a remedy.

## V.

In sum, we conclude that Carey was afforded all the procedural protections to which he was entitled and that the Election Officer's decision was not arbitrary, capricious, or an abuse of discretion. Accordingly, we affirm the district court's December 30, 1997 order upholding the Election Officer's No-vember 17, 1997 decision to disqualify Ron Carey from standing for elected office in the 1998 rerun of the 1996 IBT general election.